**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HENRY MCLEAN and EDWIN RIVERA, | 10 Civ. 3950 (DLC/GWG) |
| Plaintiffs, | (ECF CASE) |
| -against- | |
| GARAGE MANAGEMENT CORP., a New York corporation; GARAGE MANAGEMENT ASSOCIATES LLC, a Delaware limited liability company; CHAPMAN CONSULTING PAYROLL LLC, a New York limited liability company; CHAPMAN CONSULTING LLC, a New York limited liability company; and RICHARD M. CHAPMAN, Individually, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LITTLER MENDELSON
A Professional Corporation
A. Michael Weber
Elias J. Kahn
900 Third Avenue
New York New York 10022
212.583.9600
Attorneys for Defendants

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................ 1

I.   SUMMARY OF UNDISPUTED FACTS ........................................ 3

   A.   GMC ................................................................................... 3

   B.   The U.S. Department of Labor and The New York State Department of Labor's Investigations Regarding Garage Managers .................... 3

   C.   Garage Managers' Compensation ........................................... 5

   D.   Garage Managers' Responsibilities ......................................... 5

      1.   Profitability of Garage ................................................ 6

      2.   Role in Hiring, Promoting and Demoting Employees ........... 6

      3.   Role in Terminating Employees ..................................... 7

      4.   Authority to Suspend and Discipline Employees ................. 8

      5.   Garage Operation and Administration .............................. 8

      6.   Training and Coaching ................................................. 9

      7.   Employee and Customer Complaints ............................... 9

      8.   Cash Drop ............................................................... 9

      9.   Hourly Work ............................................................ 10

   E.   Opt-In Plaintiffs Who are Not Proper Members of the Conditionally Certified FLSA Collective Action Class ................................ 11

II.  SUMMARY JUDGMENT STANDARD ...................................... 12

III. GMC CANNOT BE HELD LIABLE BECAUSE IT RELIED ON A PRACTICE OF THE USDOL'S WAGE AND HOUR DIVISION IN CLASSIFYING ITS GARAGE MANAGERS AS EXEMPT EMPLOYEES .................... 12

IV.  GMC GARAGE MANAGERS QUALIFY UNDER THE EXECUTIVE EXEMPTION ........................................................................... 14

   A.   Garage Managers Received a Sufficient Salary ........................ 14

   B.   GMC Garage Managers' Primary Duty is Management ............... 15

      1.   GMC Garage Managers Performed Management Tasks ......... 15

      2.   Management Tasks were Garage Managers' Primary Duty ..... 16

   C.   Garage Managers Customarily and Regularly Directed the Work of Two or More Full Time Employees ............................................. 19

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

D.   GMC Garage Managers' Recommendations Concerning Changes of Status of Other Employees were Given Particular Weight.................................. 19

V.   EVEN IF THE GARAGE MANAGERS DO NOT QUALIFY UNDER THE EXECUTIVE EXEMPTION, THEY WERE STILL PROPERLY PAID FOR OVERTIME AND FOR ALL HOURS WORKED......................................................... 21

A.   Garage Managers were Compensated for All Hours Worked Over 40 Hours in a Week............................................................................................ 21

B.   Garage Managers were Compensated for the Time They Spent Dropping Cash at the Depot ................................................................................... 22

VI.   SEVERAL OPT-IN PLAINTIFFS' MUST BE DISMISSED FROM THE FLSA COLLECTIVE ACTION BECAUSE THEY WERE NOT GARAGE MANAGERS DURING THE RELEVANT TIME PERIOD .......................................... 22

VII.   CONCLUSION.................................................................................................. 23

# TABLE OF AUTHORITIES

PAGE

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .................................................................................. 12

*Donovan v. Burger King Corp.,*
    672 F.2d 221 (1st Cir. 1982) .................................................................... 16

*Donovan v. Burger King Corp.,*
    675 F.2d 516 (2d Cir. 1982) ..................................................................... 17

*Kahn v. Superior Chicken & Ribs, Inc.,*
    331 F. Supp. 2d 115 (E.D.N.Y. 2004) ..................................................... 14


**OTHER AUTHORITIES**

12 N.Y.C.R.R. § 137-3.2(c)(1)(i)(e) ............................................................ 15

29 C.F.R. § 541.100 ....................................................................................... 14

29 C.F.R. § 541.100(a)(1) .............................................................................. 14

29 C.F.R. § 541.100(a)(2) .............................................................................. 15

29 C.F.R. § 541.100(a)(3) .............................................................................. 19

29 C.F.R. § 541.100(a)(4) .............................................................................. 19

29 C.F.R. § 541.105 ....................................................................................... 19

29 C.F.R. § 541.106(a) ................................................................................... 16

29 C.F.R. § 541.700(b) ................................................................................... 16

29 C.F.R. §541.102 ........................................................................................ 16

29 U.S.C. § 207(a)(1) ..................................................................................... 22

29 U.S.C. § 213 (a)(1) .................................................................................... 14

29 U.S.C. § 259 ........................................................................................ 1, 12

Fed. R. Civ. P. 56(c) ...................................................................................... 12

NY Lab. Law § 651(5)(c) ............................................................................... 14

Defendants Garage Management Corp., Garage Management Associates LLC, Chapman Consulting Payroll LLC, Chapman Consulting LLC and Richard M. Chapman (collectively "GMC" or "Defendants"), by its attorneys Littler Mendelson, P.C., submit this memorandum of law in support of Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  As set forth below, the evidence demonstrates that no genuine issues of material fact exist and Defendants are entitled to summary judgment as a matter of law.

## PRELIMINARY STATEMENT

> I found that [GMC] Garage Managers were exempt executive employees under the FLSA because their primary duty was management of the garage, they supervised at least two full time employees, and they were paid on a salary basis at [the] sufficient [statutory] rate. My conclusions were consistent with the USDOL's Wage & Hour Division's *practice* concerning the application of the executive exemption to Garage Managers. I told GMC representatives about my findings concerning the exempt status of GMC's Garage Managers.

(Excerpt from the Declaration of Louis Vanegas, Former Wage and Hour Investigator at the United States Department of Labor, attached as Exhibit D to the Declaration of A. Michael Weber) (Emphasis added).

Section 10 of the Portal-to-Portal Act ("Section 10"), 29 U.S.C. § 259, provides a complete bar to liability for alleged overtime violations if an employer proves that it acted in good faith and in reliance on any administrative practice of the USDOL.  Based on Vanegas' declaration, GMC cannot be held liable for Plaintiffs' overtime claims pursuant to Section 10 because it relied in good faith on a practice of the USDOL in classifying its Garage Managers as exempt.

Vanegas' declaration also highlights the reasons why Garage Managers, including Rivera and McLean, are exempt employees who are not entitled to overtime pay.  Garage Managers supervise and direct the work of two or more full time parking attendants.  Garage Managers receive an annual salary exceeding the minimum statutory requirement.  Garage Managers have

the power to recommend terminations, hirings, promotions, demotions, transfers and suspensions, and these recommendations are given great weight. And Garage Managers' main and most important duties are their managerial tasks. A Garage Manager explained:

> [M]y most important duties are my supervisory and management duties. Anyone can park cars, but I am responsible for making sure the garage is operating correctly, directing the work of the employees who work under me and making sure the customers at my garage are satisfied."

(Excerpt from the Declaration of Bob Tansey, GMC Garage Manager, attached as Exhibit H to the Declaration of A. Michael Weber).

Thus, McLean's and Rivera's Fair Labor Standards ("FLSA")[1] and New York Labor Law ("NYLL") overtime claims fail as a matter of law because they and other GMC Garage Managers are exempt executive employees.[2]

Rivera's and McLean's claim that GMC Garage Managers were allegedly not paid for the time spent bringing each day's cash to a designated depot also fails as a matter of law. The evidence shows that Garage Managers were permitted to leave their garages during their shifts so that they could drop off the cash before the end of their shifts, they did drop off the cash during their shifts and were fully compensated for this work.

Accordingly, the Court should grant summary judgment on Plaintiffs' claims.

---

[1] Six opt-in Plaintiffs -- Antonio Cartagena, Van Gibbs, Amed Aguirre, Gabriel Arcila, Jaime Reyes and Johnny Abreu -- were not Garage Managers from May 12, 2007 to the present. Thus, these opt-in Plaintiffs should be dismissed from the FLSA collective action.

[2] Even though GMC properly classified Garage Managers as exempt executive employees, GMC still paid overtime to Garage Managers to cover itself if Garage Managers were found to be non-exempt. Garage Managers were paid a monthly payment called Extra Compensation or EC, and this EC payment was equal to or greater than the overtime pay Garage Managers would have received weekly if they had only been paid 1.5 times their regular hourly rate for all hours worked over 40 hours in a week. *See infra* Section V.A.

## I.   SUMMARY OF UNDISPUTED FACTS

### A.   GMC

GMC presently operates 59 parking garages in New York, New York and two garages in

Hoboken, New Jersey.  (*See* Rule 56.1 Statement ("56.1"), ¶ 1).[3]  Each parking garage is run by a

Garage Manager, who is responsible for managing all aspects of the garage's operations and its

profitability.  (*Id.* ¶ 2).  Garage Managers are supported by Parking Attendants (a.k.a. Runners)

who park and retrieve customers' cars, collect money and parking tickets and assist Garage

Managers in operating the garages.  (*Id.* ¶ 3).  Garage Managers bear the primary responsibility

of garage profitability and the efficient functioning of their garages. (*Id.* ¶ 4).  They confer with

Area Supervisors who almost always follow their recommendation. (*Id.*).  On their shift, each

Area Supervisor covers approximately 30 garages and relies on individual Garage Managers to

direct their garage operations.  (*Id.*).

### B.   The U.S. Department of Labor and The New York State Department of Labor's Investigations Regarding Garage Managers

In 1988 and 1993, the United States Department of Labor's ("USDOL") Wage and Hour

Division investigated GMC's compensation practices. (56.1 ¶ 5) During each of these

investigations, one of the issues the USDOL investigated was whether GMC's Garage Managers

were exempt executive employees under the Fair Labor Standards Act ("FLSA").  (*Id.* ¶ 6).

After each of the Federal investigations, the USDOL investigators told Doug Kamm, Director of

Personnel for GMC from 1986-2000, that the USDOL concluded that Garage Managers were

exempt executive employees under the FLSA. (*Id.* ¶ 7).  In 1990 and 1997, the New York State

Department of Labor ("NYSDOL") also investigated GMC's compensation practices. (*Id.* at ¶

8).  During each of these investigations, one of the issues investigated was whether GMC's

---

[3] The full recitation of undisputed facts is set forth in Defendants' Rule 56.1 Statement.

garage managers were exempt executive employees under the New York Labor Law ("NYLL"). (*Id.* ¶ 9). After each of the New York State investigations, the compliance officers told Kamm that the NYSDOL concluded that Garage Managers were exempt executive employees under the NYLL. (*Id.* ¶ 10). Kamm also took steps on his own to ascertain whether GMC's pay practices for Garage Mangers complied with the FLSA and NYLL. (*Id.* ¶ 11). Kamm reviewed the applicable FLSA and NYLL statutes and regulations, reviewed Garage Managers' job duties, interviewed Garage Managers about their jobs, observed Garage Managers on their jobs and met with attorneys concerning during the Federal and State investigations. (*Id.* ¶ 12). At all relevant times regarding this litigation, Garage Managers were compensated in the same exact method as they were paid when the USDOL and NYSDOL conducted their investigations of GMC in 1988, 1990, 1993, and 1997. (*Id.* ¶ 13).

From 1987 to 2002, Louis Vanegas was a Wage and Hour Investigator for the USDOL. (56.1 ¶ 14). In 1988, he conducted the USDOL's Wage and Hour Division's investigation of GMC's compensation practices. (*Id.* ¶ 15). One issue he investigated was whether GMC was required to pay overtime to its Garage Managers or if its Garage Managers were exempt from the overtime requirement under the FLSA. (*Id.*). As part of his investigation, he reviewed GMC's payroll records and job descriptions for Garage Managers and other relevant documents provided to him by representatives of GMC. (*Id.* ¶ 16). He visited and inspected multiple garages and talked to several Garage Managers about their job duties and compensation. (*Id.*). After completing his investigation, he wrote a memorandum summarizing the results of his investigation. (*Id.* ¶ 17). The October 26, 1988 memorandum reflected the USDOL's findings that GMC Garage Managers are exempt executive employees under the FLSA. (*Id.* ¶ 18). He found that Garage Managers were exempt executive employees under the FLSA because their

primary duty was management of the garage, they supervised at least two full time employees, and they were paid on a salary basis at the sufficient statutory rate. (*Id.*). Vanegas' conclusions were consistent with the USDOL's Wage & Hour Division's practice concerning the application of the executive exemption to Garage Managers. (*Id.* ¶ 19). Vanegas told GMC representatives about his findings regarding GMC's Garage Managers exempt status. (*Id.* ¶ 20).

### C.    Garage Managers' Compensation

Garage Managers received an annual salary.[4] (56.1 ¶ 23). Their salary ranges from May 2004 – May 2010 are summarized in the chart below. (*Id.*).

| Time Period | Salary Level |
|-------------|--------------|
| May 2004 - May 2005 | $26,300 - $72,136 |
| May 2005 - May 2006 | $28,098 - $72,780 |
| May 2006 - May 2007 | $28,098 - $72,786 |
| May 2007 - May 2008 | $30,190 - $72,786 |
| May 2008 - May 2009 | $30,190 - $63,526 |
| May 2009 - May 2010 | $31,849 - $64,176 |

Garage Managers received a monthly payment called Extra Compensation or EC. (56.1 ¶ 27). EC was, and had been planned by GMC to be, equal to or greater than the overtime pay Garage Managers would have received if they had only been paid 1.5 times their regular hourly rate for all hours worked over 40 hours in a week. (*Id.* ¶ 30).

### D.    Garage Managers' Responsibilities

Garage Managers always supervise and direct the work of two or more full-time parking attendants/runners (in 50 locations there were three or more). (56.1 ¶ 32). When asked what he does for most of the day, a Garage Manager responded: "I run the place." (*Id.* ¶ 33). When asked what this comment meant, he stated: "I tell the guys what to do." (*Id.*). Another Garage

---

[4] The only reason the payroll reflected an hourly rate was because the applicable Collective Bargaining Agreement mandated that an hourly rate be reflected in the payroll. (56.1 ¶ 25). Even though GMC viewed Garage Managers as exempt executive employees, GMC still paid overtime to Garage Managers to cover themselves in the event Garage Managers were found to be non-exempt. (*Id.* ¶ 26).

Manager testified: "The manager is responsible for anything that concerns the garage, everything." (*Id.* ¶ 34). Another Garage Manager stated: "[M]y most important duties are my supervisory and management duties. Anyone can park cars, but I am responsible for making sure the garage is operating correctly, directing the work of the employees who work under me and making sure the customers at my garage are satisfied." (*Id.* ¶ 35).

### 1.   Profitability of Garage

Richard Chapman, the principal of GMC, testified that Garage Managers were principally responsible for delivering a profit at each location: "I felt that . . . my theory of management of garages was that I certainly was unable to run multiple locations. I could not set prices. I could not discipline help. I could not repair [the] building. I could not be all over the place. I, therefore, had to rely on [Garage] managers . . . to either deliver a profit or not in an individual location." (56.1 ¶ 67). All Garage Managers were told in a letter from GMC CEO, Gordon Hamm, that business was suffering, and Garage Managers were responsible for doing whatever they could to improve GMC's business, including promoting the Garage to neighboring businesses and buildings, surveying other garages, recommending rate changes to GMC Management and ensuring that the Garage has few damage claims. (*Id.* ¶ 68). The Garage Managers who were shown this letter during deposition, including McLean and Rivera, testified that this letter accurately stated that they are responsible for these tasks and for improving GMC's business and profitability. (*Id.* ¶ 69).

### 2.   Role in Hiring, Promoting and Demoting Employees

Garage Managers have the authority to recommend hirings of employees for their garages or other garages and their hiring recommendations carry great weight and are usually followed by GMC. (56.1 ¶ 40). For example, one Garage Manager testified at deposition that his recommendations for hiring employees were always accepted. (*Id.* ¶ 41). He also recommended

that certain runners be transferred to his garage, and these recommendations were all accepted. (*Id.*). Furthermore, he stated that, at Red Ball Garage, he interviews people for the garage and he recommends who should work at the garage; all of his recommendations were accepted. (*Id.*). Another Garage Manager stated that he recommended multiple people from his former parking garage company for hiring at GMC because he thought they were good employees; all of his hiring recommendations were accepted, except for one because the individual did not pass a test. (*Id.* ¶ 42). Named Plaintiff Henry McLean also repeatedly requested that GMC hire additional people to work at his garage (Carlton Garage) and his requests for additional employees at his garage were always granted. (*Id.* ¶ 45).

Garage Managers also have authority to recommend promotions and demotions, and their promotion/demotion recommendations carry great weight and are usually followed by GMC. (56.1 ¶ 46). For example, named Plaintiff Edwin Rivera recommended that Mauricio Gonzalez be demoted in or about May 2009, and GMC subsequently demoted him from Relief Foreman to Floater. (*Id.* ¶ 47). Another Garage Manager stated all of his promotion and demotion recommendations have been accepted, and that within the last year he has recommended two promotions and one demotion, all of which have been accepted. (*Id.* ¶ 49).

### 3.     Role in Terminating Employees

Garage Managers have the authority to recommend terminations of employees in their garages and their termination recommendations are given great weight and are usually followed by GMC. (56.1 ¶ 52). For example, named Plaintiff Henry McLean recommended that GMC terminate Albeiro Duque (Runner) in or about August 2009 and GMC subsequently fired Duque. (*Id.* ¶ 53). In or about November 2009, McLean also recommended transferring Jean Lizaire (Runner) out of his garage and GMC subsequently transferred Lizaire. (*Id.*). Another Garage Manager stated that his termination recommendations are always accepted, and that as recently

7

as March or April 2011 he recommended the termination of his Assistant Manager, and the Assistant Manager was terminated (*Id.* ¶ 56).

### 4.    Authority to Suspend and Discipline Employees

Garage Managers have the authority to recommend suspensions and discipline, and these recommendations are given great weight and are usually followed by GMC. (56.1 ¶ 58).  For example, Plaintiff Edwin Rivera has recommended suspensions for many employees, such as Jeffrey Gonzalez (Runner), Max Midy (Night Foreman) (3 separate suspension recommendations by Rivera for Midy), and Mauricio Gonzalez, and all of Rivera's suspension recommendations have been followed (*Id.* ¶ 59).  Another Garage Manager stated that his suspension recommendations are always accepted and that a couple of months ago he recommended that a Runner be suspended for three days and this recommendation was accepted. (*Id.* ¶ 61).  Garage Managers also stated that they could send employees home for the day without getting a Supervisor's approval.  (*Id.* ¶ 63).

### 5.    Garage Operation and Administration

One Garage Manager testified: "I'm in charge of the entire operations of the garage" (56.1 ¶ 79).  Operating and administering the garages include several duties.  For example, Garage Managers are responsible for the safety of the employees and customers at the garage and the security of the garage.  (*Id.* ¶ 80).  Named Plaintiff Edwin Rivera testified that the first thing he does when he comes in is that he walks the garage, inspects it, makes sure the exits are clear and sees what the capacity of the building is like for the day.  (*Id.* ¶ 81).

Other Garage Manager duties concerning the operation of the garage include: (1) pointing out problems with the physical condition of the garage to maintenance staff for repair; (2) preparing parking attendants' payroll and verify their time cards; (3) making sure the garage has enough supplies and ordering supplies; (4) ensuring employees take meal breaks; (5) ensuring

that parking attendants wear proper uniforms and are properly groomed; and (6) preparing employee schedules. (56.1 ¶¶ 82-89).

### 6.    Training and Coaching

Garage Managers are responsible for training parking attendants in all facets of the garage's operations. (56.1 ¶ 90). Garage Managers also teach and coach employees on a daily basis. (*Id.*). For example, one Garage Manager stated: "I coach runners every day. When I see runners doing something incorrectly, I correct them and teach them how to do it properly." (*Id.*).

### 7.    Employee and Customer Complaints

Garage Managers must deal with complaints from the employees working under them, including runners' complaints about other runners' deficient performance, arguments between runners, and complaints regarding scheduling. (56.1 ¶ 91). Garage Managers are responsible for handling customer complaints at the garage; for example, when customers complain about damage to their cars, Garage Managers are responsible for investigating the damage claim and writing a report that summarizes and assesses the damage claim. (*Id.* ¶ 92). Parking attendants do not have the authority to write this damage claim report. (*Id.* ¶ 93).

### 8.    Cash Drop

Garage Managers are responsible for dropping the day's cash at GMC collection depots. (56.1 ¶ 95). It was company policy to inform all managers to either leave their garages during their shift or to leave 15 minutes earlier than the end of their shifts in order to make the cash drop. (*Id.* ¶ 96). One Garage Manager testified at deposition that he always drops off the day's cash at the depot during his shift. (*Id.* ¶ 97). Another Garage Manager testified at deposition that he never had to leave his garage to make the cash drop because the main safe was located inside his garage. (*Id.* ¶ 98). Another Garage Manager testified at deposition that he left his garage before the end of his shift so that he could drop off the day's cash at the depot before his

shift ended and was compensated for his full shift. He testified that GMC allowed him to leave as early as necessary to drop off the day's cash before his shift ended. (*Id.* ¶ 99).

Another Garage Manager testified at deposition that the depot is located at his present garage so he presently does not have to leave his garage to drop off the day's cash. (56.1 ¶ 100). He said that at his previous garages, he left early to drop off the cash before his shift ended. (*Id.*). When asked if he was told he should leave early from the garage to drop off the cash before the end of his shift he answered: "Yeah, that's been told by most of the managers because we have to leave.  If we go after that so they would have to pay for that.  So we leave on the company time to do that, and they said it's okay to do so."  (*Id.*).   Another Garage Manager testified in the following ways regarding the daily cash drop off: (1) he is permitted to leave early to drop off the cash before his shift ends; (2) he said: "I would either leave early, come back and then punch out, or if I had time during regular working hours, I would go and do it; and (3) he said that he was "always" on the clock when he dropped off the daily cash.  (*Id.* ¶ 101).

Several Garage Managers have also submitted declarations stating that they were told by GMC that they are permitted to leave early so that they would have enough time to drop of the day's cash at a central depot before their shift ended or that they can drop off the cash at an earlier point during the shift.  (*Id.* ¶ 102).  They also stated that they have always dropped off the daily cash during their shifts and were compensated for this work.  (*Id.*).  Two Garage Managers also stated in declarations that the depot was inside their garages so they did not have to leave the garage to make the drop.  (*Id.*).

### 9.   Hourly Work

Garage Managers spend the majority of their day performing managerial duties rather than moving cars or other manual work; for example, one Garage Manager stated he that he spends 95% of his time in managerial duties and 5% of his time on non-managerial duties, such

as parking and moving cars (56.1 ¶ 104).  When asked about his duties at the garage, this same Garage Manager replied: "[I] [r]un the garage. I had guys with me and just run the garage.  I was a manager." (*Id.*).  Other Garage Mangers testified at deposition they spend about 10-40% of their time on non-managerial duties. (56.1 ¶¶ 105-109).  Several Garage Managers also stated in declarations that they spend most of their time on their supervisory and management tasks and/or that their supervisory and management tasks are their most important and main tasks they perform at their garages.  (*Id.* ¶ 110).

Garage Managers stated that even while they were performing manual work, they would still continue to supervise the parking attendants.  (56.1 ¶ 111).  For example, one Garage Manager stated that when he does manual work, he "never take[s] [his] eyes off the parking attendants because [he] want[s] to make sure all the cars are safe, because some of them are new, so you have to make sure they don't hit another car." (*Id.* ¶ 113).  Another Garage Manager stated: "I have to get my eyes on everything, controlling everything, giving the guys their duties." (*Id.* ¶ 111).  Another Garage Manager stated that he always supervising his employees while performing manual work, and that since his "garage is a very open place, . . . it is very easy for [him] to see what [his] employees are doing all day long." (*Id.* ¶ 112).

### E.   Opt-In Plaintiffs Who are Not Proper Members of the Conditionally Certified FLSA Collective Action Class

Opt-in plaintiffs Antonio Cartagena, Van Gibbs, Amed Aguirre, Gabriel Arcila, Jaime Reyes and Johnny Abreu are not properly part of this potential collective action class because they were not Garage Managers from May 12, 2007 to the present. (56.1 ¶¶ 115-121).  Thus, these individuals should be dismissed from the FLSA collective action.

## II.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial, and summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. The undisputed facts show that GMC is entitled to summary judgment.

## III.   GMC CANNOT BE HELD LIABLE BECAUSE IT RELIED ON A PRACTICE OF THE USDOL'S WAGE AND HOUR DIVISION IN CLASSIFYING ITS GARAGE MANAGERS AS EXEMPT EMPLOYEES

Section 10 of the Portal-to-Portal Act ("Section 10") provides a complete bar to FLSA liability if an employer proves that it acted in good faith in conformity with and reliance on any administrative practice or enforcement policy of the USDOL:

> No employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the FLSA if the employer pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the [Administrator of the Wage and Hour Division of the DOL], *or any administrative practice or enforcement policy of [the Administrator].*

29 U.S.C. § 259. (Emphasis added.) As explained below, GMC has a valid Section 10 defense because there is no dispute that GMC acted in good faith in relying on an administrative practice of the USDOL in classifying GMC's Garage Managers as exempt.

Doug Kamm, Director of Personnel at GMC from 1986-2000, has sworn that he was orally advised by USDOL investigators in 1988 and 1993 and by NYSDOL investigators in 1990

and 1997 that GMC Garage Managers are exempt executive employees (*See* 56.1 ¶¶ 2-10).   In addition, at all relevant times regarding this litigation, Garage Managers were compensated in the same exact method as they were paid when the USDOL and NYSDOL conducted their investigations of GMC in 1988, 1990, 1993, and 1997.   (*Id.* ¶ 13).   The investigator who conducted the investigation of Garage Managers' exemption status in 1988, Louis Vanegas, has sworn that he authored a written memorandum, which reflects his finding that the GMC Garage Managers are exempt executive employees under the FLSA. (*Id.* ¶¶ 14-20).   Vanegas states that he found that Garage Managers were exempt executive employees under the FLSA because their primary duty was management of the garage, they supervised at least two full time employees, and they were paid on a salary basis at a sufficient rate.  (*Id.* ¶ 18).

Importantly, Vanegas has stated that his "conclusions were consistent with the USDOL's Wage & Hour Division's ***practice*** concerning the application of the executive exemption to Garage Managers."  (*Id.* at ¶ 19).  (Emphasis added).   Vanegas stated that he told GMC representatives about his findings concerning the exempt status of GMC's Garage Managers. (*Id.* at ¶ 20).   Furthermore, in assessing Garage Managers' exemption status, Kamm reviewed the applicable FLSA and NYLL statutes and regulations, interviewed Garage Managers about their jobs, reviewed Garage Managers' job duties, observed Garage Managers on their jobs and met with attorneys concerning during the Federal and State investigations.  (*Id.* at ¶¶ 11-12). GMC's pay practice on which Vanegas provided his imprimatur is the same practice GMC followed throughout all the relevant times in this case.

This evidence indisputably demonstrates that GMC acted in good faith on the USDOL's practice concerning the application of the executive exemption to Garage Managers. Thus, GMC cannot be held liable under the FLSA pursuant to Section 10 of the Portal-to-Portal Act.[5]

## IV.   GMC GARAGE MANAGERS QUALIFY UNDER THE EXECUTIVE EXEMPTION

Both the NYLL and FLSA provide a statutory exemption from overtime requirements for employees who are properly classified as bona fide executives. 29 U.S.C. § 213 (a)(1); NY Lab. Law § 651(5)(c).[6]

The term "employee employed in a bona fide executive capacity" means any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week; (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) Who customarily and regularly directs the work of two or more other employees; and (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100.

The undisputed facts establish that GMC Garage Managers satisfy each of the four requirements for the executive exemption. Accordingly, the Court should grant summary on all four counts of the Amended Complaint.

### A.   Garage Managers Received a Sufficient Salary

To qualify as a bona fide executive, an employee must be paid a salary of at least $455 per week – or, $23,660 annually. 29 C.F.R. § 541.100(a)(1). Garage Managers have always

---

[5] GMC also cannot be held liable under the NYLL because Federal courts evaluate New York's executive exemption by reference to the FLSA and its regulations. *Kahn v. Superior Chicken & Ribs, Inc.,* 331 F. Supp. 2d 115, 117 (E.D.N.Y. 2004).

[6] As stated above, Federal courts evaluate New York's executive exemption by reference to the FLSA and its regulations. *Kahn,* 331 F. Supp. 2d at 117.

received an annual salary exceeding this minimum requirement.  (*See* 56.1 ¶¶ 23-24).   The salaries of Garage Managers also are equal to or above the applicable New York State per week requirement.[7]

### B.    GMC Garage Managers' Primary Duty is Management

To qualify as a bona fide executive, an employee's primary duty must be the management of an enterprise or of a customarily recognized department or subdivision thereof. 29 C.F.R. § 541.100(a)(2)  .  The undisputed facts establish that the Garage Managers' primary duty was management of their garages.

### 1.    GMC Garage Managers Performed Management Tasks

The Garage Managers' testimony demonstrates the managerial nature of their jobs. Among other things, GMC Garage Managers: direct the parking attendants' work, recommend hirings, terminations, promotions, suspensions and discipline of employees--these recommendations are usually accepted; prepare work schedules; train and coach parking attendants; order supplies for the garage, prepare payroll and verify employees' time cards; ensure the safety of the employees and customers at the garage; make sure that the garage is secure from thieves and other danger; report problems with the physical condition of the garage and recommend repairs; ensure the profitability of the garage--which includes negotiating rates with customers, surveying garages and preparing reports on other garages' rates, promoting the garage to neighboring businesses and buildings and making suggestions on rate changes and other business improvements; deal with employee complaints, handle customer complaints--

---

[7] Under New York State law, a bona fide executive employee's salary must be no less than $536.10 per week between January 1, 2007 and July 23, 2009 and no less than $543.75 per week on and after July 24, 2009. From March 31, 2000-Dec. 31, 2005, the minimum was $386.25 per week; from Jan. 1, 2005 – Dec. 31, 2005 the minimum was $450.00 per week; from Jan. 1, 2006 – Dec. 31, 2006 the minimum was $506.25 per week.  12 N.Y.C.R.R. § 137-3.2(c)(1)(i)(e).

including complaints about damage to cars; investigate damage and write damage reports; contact customers when they are late in paying; make sure that employees wear proper uniforms and take meal breaks; and ensure that parking attendants comply with all company regulations. (56.1 ¶¶ 2, 32-94). Such activities are examples of managerial work. *See* 29 § C.F.R. 541.102; *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) (recognizing that supervision of other employees is clearly a management duty and that "[e]nsuring that company policies are carried out constitutes the very essence of supervisory work") (internal quotations omitted).

### 2.   Management Tasks were Garage Managers' Primary Duty

The term "primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700. An employee who spends more than 50 percent of his or her time on exempt work "will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). Garage Managers spend more than 50 percent of their time on managerial work, instead of non-exempt work, such as moving cars. (*See* 56.1 ¶ 104). For example, one Garage Manager stated he that he spends 95% of his time in managerial duties and 5% of his time on non-managerial duties (*Id.*). When asked about his duties at the garage, this Garage Manager replied: "[I] [r]un the garage. I had guys with me and just run the garage. I was a manager." (*Id.*). In another example, a Garage Manager stated that he spends about 10-30 percent of his day on parking duties and the rest of his time on managerial duties. (*Id.* ¶ 105).

The FLSA regulations also expressly permit executive employees to concurrently perform non-exempt duties while they are supervising employees. 29 C.F.R. § 541.106(a). Garage Managers stated that even while performing manual work, they simultaneously supervised employees. (*See* 56.1 ¶¶ 111-113).

To determine the relative importance of an employee's managerial to non-managerial tasks, courts also consider the significance of the managerial tasks to the success of the facility.

*See Donovan v. Burger King Corp.*, 675 F.2d 516, 517 (2d Cir. 1982).  It is indisputable that GMC Garage Managers' managerial tasks are critical to the success of GMC's parking garages.

The principal of GMC, Richard Chapman, testified that all of the Garage Managers are responsible for delivering a profit at each garage.  (56.1 ¶ 67).  He also explained that he relies on the Garage Managers to carry out tasks that he and the Garage Supervisors could not possibly carry out on their own at every garage including, among others, running and operating the garage on a daily basis, negotiating prices with all customers, recommending rates for each garage, recommending repairs to each garage and supervising the parking attendants on a daily basis and recommending discipline.  (*Id.*).

Gordon Hamm, GMC CEO, wrote a letter to all Garage Managers in October 2009 stating that business was suffering, and Garage Managers were responsible for doing whatever they could to improve GMC's business, including promoting the Garage to neighboring businesses and buildings,[8] surveying other garages, recommending rate changes to GMC Management and ensuring that the Garage has few damage claims. (*Id.* ¶ 68). Garage Managers who reviewed this letter at deposition, including McLean and Rivera, testified that it accurately stated that they are responsible for these managerial duties and for helping to ensure GMC's success at each garage.  (*Id.* ¶ 69).

Any doubt that Garage Managers' managerial and supervisory duties are less important than their non-exempt duties is also erased by the Garage Managers' testimony and statements about their main duties.  When asked what he does for most of the day, one Garage Manager responded: "I run the place."  When asked what this meant, the Garage Manager stated: "I tell the guys what to do." (*Id.* ¶ 33).  Another Garage Manager stated: "The manager is responsible

---

[8] Garage Managers are given business cards that say Garage Manager on them to help them promote their garage. (56.1 ¶ 77).

for anything that concerns the garage, everything." (*Id.* ¶ 34). And another Garage Manager stated: "I would not recommend anything [to GMC upper Management] unless it's profitable for *my* company." (*Id.* ¶ 70) (Emphasis added). And another Garage Manager stated: "I'm in charge of the entire operations of the garage." (*Id.* ¶ 79). And another Garage Manager stated: "My job is to make the guys do the job." (*Id.* ¶ 39). And another Garage Manager stated: "[M]y most important duties are my supervisory and management duties. Anyone can park cars, but I am responsible for making sure the garage is operating correctly, directing the work of the employees who work under me and making sure the customers at my garage are satisfied." (*Id.* ¶ 35). And yet another Garage Manager stated: "As a Garage Manager, my most important duties are my managerial and supervisory duties because if I do not properly direct and supervise the parking attendants' work then the garage would be a mess and it would not operate properly." (*Id.* ¶ 36). Several Garage Managers also stated in declarations that they spend most of their time on their supervisory and management tasks and/or that their supervisory and management tasks are their most important and main tasks they perform at their garages. (*Id.* ¶ 110).

In sum, Garage Managers spend more than 50% of their time on managerial tasks, they concurrently supervise employees while performing non-exempt work, and their management work is critical to the success of each GMC garage. Most important, their testimony and declarations show that their management and supervisory duties are their main and most significant tasks. Upon consideration of these undisputed facts, a reasonable jury could not find that the GMC Garage Managers' primary duty, including McLean and Rivera's, was anything other than management. Simply put, they run their garages.

**C.    Garage Managers Customarily and Regularly Directed the Work of Two or More Full Time Employees**

A bona fide executive must customarily and regularly direct the work of two or more full time employees. 29 C.F.R. § 541.100(a)(3). Garage Managers supervise and direct the work of two or more full time parking attendants (in 50 locations there were three or more). (*See* 56.1 ¶ 32).

**D.    GMC Garage Managers' Recommendations Concerning Changes of Status of Other Employees were Given Particular Weight**

A bona fide executive must have the authority to hire or fire other employees or the executive's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees must be given particular weight. 29 C.F.R. § 541.100(a)(4). "An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105. GMC Garage Managers meet this test.

First, Garage Managers have the authority to recommend hirings, and these recommendations are usually accepted. (*See* 56.1 ¶ 40). For instance, one Garage Manager said that he interviews people for his garage and that all of his recommendations for hiring employees have been accepted. (*Id.* ¶ 41). Another Garage Manager stated that he recommended multiple people from his former parking garage company for hiring at GMC because he thought they were good employees; all of his hiring recommendations were accepted, except for one because the individual did not pass a test. (*Id.* ¶ 42). Another Garage Manager said he made numerous hiring recommendations, which were mostly followed (*Id.* ¶ 43). He said his last hiring recommendation, which was made in early 2011, was accepted (*Id.*). Further, named Plaintiff

Henry McLean also repeatedly requested that GMC hire additional people to work at his garage (Carlton Garage) and his requests were always granted. (*Id.* ¶ 45).

Second, Garage Managers can recommend terminations of employees in their garages, and these recommendations are also given particular weight (*Id.* ¶ 52). For example, named Plaintiff Henry McLean recommended that GMC terminate Runner Albeiro Duque and GMC subsequently fired Duque. (*Id.* ¶ 53). McLean also recommended transferring Runner Jean Lizaire out of his garage and GMC subsequently transferred Lizaire. (*Id.* ). One Garage Manager said that all of his recommendations for terminating employees have been accepted. (*Id.* ¶ 54). Another Garage Manager said he has recommended terminations of multiple employees, and all of his termination recommendations have been accepted by GMC (*Id.* ¶ 55). Another Garage Manager stated that his termination recommendations are always accepted, and that his recent recommendation to terminate his Assistant Manager was followed (*Id.* ¶ 56). Another Garage Manager said his suggestions were followed 75% of the time and that his last termination recommendation, which he made in early 2011, was followed. (*Id.* ¶ 57).

Third, Garage Managers also can recommend promotions or demotions, and these recommendations are usually accepted. (*Id.* ¶ 46). For example, named Plaintiff Edwin Rivera recommended that Relief Foreman Mauricio Gonzalez be demoted in or about May 2009, and GMC subsequently demoted him to Floater. (*Id.* ¶ 47). One Garage Manager testified his recommendations for promotions have always been accepted. (*Id.* ¶ 48). Another Garage Manager stated all of his promotion and demotion recommendations have been accepted, and that within the last year he has recommended two promotions and one demotion, all of which have been accepted. (*Id.* ¶ 49). Another Garage Manager stated that all of his recommendations for promotions have been accepted, and the parking attendants that he recommended for

promotion over they last couple of years were promoted. (*Id.* ¶ 50). Another one said he has made about 10-15 promotion recommendations and they were followed most of the time (*Id.* ¶ 51).

Fourth, Garage Managers have the authority to recommend suspensions and discipline, and these recommendations are usually accepted.[9] (*See* 56.1 ¶ 58). For example, named Plaintiff Edwin Rivera has recommended suspensions for multiple employees, and all of Rivera's suspension recommendations have been followed. (*Id.* at ¶ 59). One Garage Manager stated that his suspension recommendations are always accepted and that a couple of months ago he recommended that a Runner be suspended for three days and this recommendation was accepted. (*Id.* ¶ 61). Another Garage Manager testified that his assistant called him while he was not at work to tell him a parking attendant was coming in late; he recommended suspension of the parking attendant and his recommendation was implemented. (*Id.* ¶ 62).

Thus, the undisputed facts establish that GMC Garage Managers' (including McLean and Rivera's) recommendations as to the hiring, firing, promotion or any other change of status of employees are given great weight.

## V.   EVEN IF THE GARAGE MANAGERS DO NOT QUALIFY UNDER THE EXECUTIVE EXEMPTION, THEY WERE STILL PROPERLY PAID FOR OVERTIME AND FOR ALL HOURS WORKED

### A.   Garage Managers were Compensated for All Hours Worked Over 40 Hours in a Week

Even though GMC classified Garage Managers as exempt executive employees, GMC still paid overtime to Garage Managers to cover themselves in the event Garage Managers were found to be non-exempt. (56.1 at ¶ 26). Under the FLSA, it is necessary to pay non-exempt employees 1.5 times the regular rate of pay for all hours over 40 in a week. 29 U.S.C. §

---

[9] In addition, Garage Managers can send employees home for the day without Supervisor approval (*Id.* ¶ 63).

207(a)(1).  Garage Managers were paid a monthly payment called Extra Compensation or EC. (56.1 at ¶ 27).  The EC payment was, and had been planned by GMC to be, equal to or greater than the overtime pay Garage Managers would have received weekly if they had only been paid 1.5 times their regular hourly rate for all hours worked over 40 hours in a week.  (*Id.*  ¶¶ 30-31, showing examples of calculations for Garage Managers Henry McLean, Edwin Rivera and Bolivar Cartagena).  Thus, the Court should grant summary judgment on Plaintiffs' First and Second Causes of Action alleging that they were not paid overtime for all hours worked over 40 in a week.

### B.      Garage Managers were Compensated for the Time They Spent Dropping Cash at the Depot

Plaintiffs' Amended Complaint claims that Garage Managers were not paid for the time they spent dropping off the daily cash at a designated depot (Amd. Compl. ¶ 27; Amd. Compl. Third and Fourth Causes of Action).  The Garage Managers' undisputed testimony demonstrates that this claim should be dismissed as a matter of law.  Garage Managers were permitted to leave their garages during their shifts so that they could drop off the cash before the end of their shifts, and this is what Garage Managers did. (*See* 56.1 ¶¶ 96-102).  Some Garage Managers also testified that the depot was in their own garage so they never had to leave the garage to make the drop off. (56.1 ¶¶ 98, 102).  Thus, the Court should grant summary judgment on Plaintiffs' Third and Fourth Causes of Action alleging they were not paid for all hours worked.

### VI.    SEVERAL OPT-IN PLAINTIFFS' MUST BE DISMISSED FROM THE FLSA COLLECTIVE ACTION BECAUSE THEY WERE NOT GARAGE MANAGERS DURING THE RELEVANT TIME PERIOD

On August 11, 2010, the Court approved an FLSA Notice of Pendency of Lawsuit Regarding Wages, which defined the potential FLSA collective action class as individuals who "were employed as a Garage Manager by Garage Management Corporation at any time from

May 12, 2007 to the present." (56.1 ¶ 114).  Six opt-in Plaintiffs -- Antonio Cartagena, Van Gibbs, Amed Aguirre, Gabriel Arcila, Jaime Reyes and Johnny Abreu -- were not Garage Managers from May 12, 2007 to the present.  (*Id.* ¶¶ 115-121).  Thus, these opt-in Plaintiffs should be dismissed from the FLSA collective action.

## VII.   CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court grant its motion for summary judgment in its entirety and dismiss Plaintiffs' Amended Complaint against Defendants as a matter of law, and order such other and further relief as the Court deems just and proper.

Date:   April 22, 2011
New York, New York

_____   /s/
A. Michael Weber
Elias J. Kahn
LITTLER MENDELSON
   A Professional Corporation
900 Third Avenue
New York, NY  10022.3298
212.583.9600

Attorneys for Defendants