C26zmclc                         Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HENRY MCLEAN and EDWIN RIVERA,

                Plaintiffs,

            v.                        10 CV 3950 (DLC)
                                      09 CV 9325 (DLC)

GARAGE MANAGEMENT CORP., et
al.,

                Defendants.

------------------------------x

                                      February 6, 2012
                                      2:00 p.m.

Before:

                    HON. DENISE L. COTE,

                                      District Judge

                        APPEARANCES

KAHN OPTON LLP
      Attorneys for Plaintiff Class
BY:  STEPHEN H. KAHN

LAW OFFICE OF JUSTIN A. ZELLER
      Attorneys for Plaintiff Ramirez
BY:  BRANDON D. SHERR

LITTLER MENDELSON
      Attorneys for Defendants
BY:  MICHAEL WEBER ELIAS KAHN

C26zmclc                        Conference

1          THE COURT:  We'll take appearances.  We have two cases

2    here.  The first one is Mclean 10 Civ. 3950, the second is

3    Ramirez 09 Civ. 9325.

4          Let's take appearances first in Mclean for the

5    plaintiffs.

6          MR. KAHN:  Stephen H. Kahn, the law firm of Kahn Opton

7    LLP.

8          THE COURT:  And you are assisted by?

9          MR. KAHN:  No.

10          THE COURT:  No.  You're in this case, the plaintiffs?

11          MR. SHERR:  Yes, ma'am, Brandon Sherr from the Law

12    Office of Justin A. Zeller for the Ramirez plaintiff.

13          THE COURT:  Okay, thank you.

14          And for Garage Management, the defendant in both

15    cases?

16          MR. WEBER:  Michael Weber and Elias Kahn, Littler

17    Mendelson.  Also --

18          MS. HERZBERG: I'm not stating an appearance.  I'm here

19    on behalf of Garage Management instead of the client, Aliza

20    Herzberg.

21          THE COURT:  Okay, Aliza?

22          MS. HERZBERG:  A-l-i-z-a, Herzberg, H-e-r-z-b-e-r-g.

23          THE COURT:  And also Mr. Weber.

24          MR. WEBER:  Yes, your Honor, Michael Weber and Elias

25    Kahn, counsel for the defendants in both cases.  My colleague,

1    Elias Kahn.

2              THE COURT:  Oh, I'm sorry.  Thank you.  Much

3    appreciated.

4              So I have a series of letters.

5              I have a January 30th letter from the plaintiffs in

6    the McLean case, a February 2nd letter from defense counsel,

7    and February 3rd submissions from Mr. Kahn and from defense

8    counsel.

9              There are two sets of issues at least that we need to

10   address today, and one is the issue about the opt outs, and a

11   second is the issue of the time records or time cards.

12             We are facing a pretrial order date of February 17th

13   in this case.  These cases are on the March 12th trial ready

14   calendar.

15             I issued an opinion in August of last year, dealing

16   with some of the defenses the defendants had sought to

17   interpose with respect to overtime pay claims.  And a

18   scheduling order in October set the schedule, largely set the

19   schedule under which we're now operating.

20             The question of the opt outs is a very significant

21   one.  The notice to the class was mailed on or about

22   November 23rd.  And I understand that there are roughly 17 opt

23   outs so far, that at least the Court has record of.  I don't

24   know precisely how large the class is, but there were 68

25   garages at the time of the opinion that was issued last year.

C26zmclc                        Conference

1              And the dates of the exclusion requests that we have

2    records of, run from early December, December 11th up until

3    January 19th.  Only a handful were received before by this

4    Court before January 24th.

5              Almost of the exclusion requests that we have received

6    are dated -- well, were received by the Court between

7    January 24th and January 27th -- at least that's when it was

8    entered in the Court's records.  And the dates of those

9    exclusion requests on the documents, themselves, run

10   principally since January 18th, though there are a handful from

11   an earlier period of time.

12             When I issued the order in this case that dealt with

13   some of the scheduling issues and also with -- well, let me

14   start again.

15             When I issued my October 21st order, which dealt with

16   some of the findings for certification of a class, I ordered,

17   among other things, that defense counsel may not communicate or

18   cause his clients to communicate with class members regarding

19   this litigation and the decision to opt out of the class

20   action, unless prior consent is obtained from the Court or

21   class counsel.

22             And in a recent endorsement of January 17th, I

23   permitted the defendants to speak with garage managers about

24   this litigation, but only when the garage manager initiated the

25   conversation, and only to provide the garage manager with

1  another copy of the notice and its attached exclusion request,

2  or to direct the garage manager to plaintiffs' counsel.

3          It would appear that the letter of the order was not

4  followed, nor was the spirit complied with.  I have a

5  declaration from a Mike Isaac, I-s-a-a-c, submitted with a

6  February 2nd letter from defense counsel, which is less than

7  clear about precisely who did what, but it looks as if

8  Mr. Isaac was requested to and did contact and initiate

9  discussions with garage managers about this litigation.

10          I have an application from plaintiffs' counsel to

11  address 13 requests -- that's plaintiffs' counsel number --

12  essentially, all requests to opt out of the class action

13  generated on January 17th or thereafter.

14          And based on the history here and the pattern of the

15  submission of these opt out requests at the very end of the

16  class period, which is to close or did close January 27th, I am

17  going to make inquiry and, if necessary, conduct a hearing.  I

18  would want Mr. Isaac, and anyone else from Garage Management

19  Corporation, who had contact with any individual opting out

20  plaintiff to testify.  Depending on what I hear at that

21  hearing, I will take testimony from each of the plaintiffs who

22  opted out on January 17th or thereafter.  But I think for our

23  purposes, we should assume that those opt out requests may be

24  stricken.

25          MR. WEBER:  Can I ask for a clarification, your Honor?

C26zmclc                         Conference

1          THE COURT:  Yes.

2          MR. WEBER:  The declaration of Mike Isaac, to me,

3     complies with your Court's ruling, as far as responding to

4     inquiries.  So I understand you may want a hearing to get

5     further testimony.

6          When you say "may be stricken," under what

7     circumstances would the Court consider striking the opt outs?

8          THE COURT:  Okay.  Well, let's look at Mr. Isaac's

9     declaration.  I mean, the ultimate issue here is whether

10    intimidation and fears of retaliation have driven an individual

11    to opt out of the class, when that individual would not

12    otherwise have chosen to do so.  So those are the rights that

13    are at stake here.

14          Looking at Mr. Isaac's declaration, he says "That

15    garage managers contacted Garage Management Corporation to

16    notify us," et cetera.

17          I don't know which garage managers contacted who at

18    Garage Management Corporation.  I don't know if Mr. Isaac is

19    referring to himself, though he's speaking in the third person.

20    I don't know who he refers to, who he is referring to as "us".

21          Then later on in paragraph four, Mr. Isaac says, "I

22    was asked to deliver the forms to the manager."  It doesn't

23    identify who made that request of him.  Later in that same

24    paragraph, he says, "Once it got out that several managers had

25    not received the court-issued paperwork, I delivered the papers

C26zmclc                    Conference

1   to these managers."  Again, it's unclear because the specifics

2   are not stated, but the phrasing suggests that Mr. Isaac

3   initiated conversations with various garage managers.

4         So we need to flesh out the facts.  We need to figure

5   out whether or not orders were or were not obeyed, and we need

6   to figure out ultimately whether individual garage managers who

7   opted out did so because of pressure or fear.

8         MR. WEBER:  Thank you for that clarification, your

9   Honor.

10        THE COURT:  So I'm happy to hold the hearing this

11  week.  I could do it tomorrow.  I'll let counsel, at the

12  conclusion of this hearing, compare their schedules and we'll

13  set a hearing date.  And we'll start with Mr. Isaac and any

14  other employee of Garage Management Corporation who had a

15  conversation with a garage manager who opted out.

16        MR. KAHN:  Your Honor, if I may inquire?

17        THE COURT:  Yes, Mr. Kahn.

18        MR. KAHN:  Thank you.  Will the Court conduct the

19  inquiry or is counsel invited to question Mr. Isaacs and any

20  other witnesses?

21        THE COURT:  Counsel will start the inquiry.

22        MR. KAHN:  Will examine.

23        THE COURT:  I'll feel free to ask questions.

24        MR. KAHN:  Thank you, Judge.

25        THE COURT:  Okay.  There was a request in these

C26zmclc                      Conference

1    letters to extend the opt out period.  That's denied.

2            I will want from Mr. Kahn an affidavit about mailing,

3    to certify that the mailings were sent on or about

4    November 23rd to the addresses that were provided by the

5    defendants.

6            Do you have any problems with that, Mr. Kahn?

7            MR. KAHN:  None whatsoever, Judge.

8            THE COURT:  When can you get that in?

9            MR. KAHN:  I'll have that when we appear in court this

10   week.

11           THE COURT:  Okay, good.

12           Let's turn to the time card issue.  This issue has

13   enormous significance for the calculation of damages, at least

14   it would appear to have that impact from the defendants'

15   submission.  It's unclear to me, based on the parties' letters,

16   when the defendants first notified plaintiffs' counsel that

17   they were taking the position that the payroll records were not

18   reliable.

19           MR. KAHN:  Your Honor --

20           THE COURT:  And that the time cards reflected

21   different hours worked each week than is reflected in the

22   payroll records.

23           MR. KAHN:  Your Honor, I know that date.  It was in a

24   letter addressed to Judge Gornstein that I was copied on, dated

25   December 7, and delivered to me by e-mail on December 7.  I

1    believe in the afternoon, although I'm not sure of that.

2                THE COURT:  Okay.

3                MR. KAHN:  Pearl Harbor Day, for sure.

4                THE COURT:  So, Mr. Weber, why don't you address this

5    situation, to the extent you have something you'd like to say.

6                MR. WEBER:  Thank you, your Honor.

7                As your Honor knows, we, the defendants, took the

8    position that garage managers were exempt; that they worked --

9    since they were exempt, actual hours didn't matter.  Whether

10   they worked 20 hours or 100 hours, they're exempt managers;

11   doesn't matter from an overtime point of view.

12               When your Honor ruled contrary to that, that they were

13   non-exempt, we had discussions with Mr. Kahn and we offered for

14   him to come and see the actual time records at GMC -- and

15   they're quite extensive -- to show that times varied when they

16   and -- when they started and when they ended.  Those are the

17   actual hours worked.  We never obviously thought that was

18   relevant, because they're exempt; didn't matter what their

19   hours were.

20               Now, as your Honor may recall, the treatment of the

21   managers is complex because they're covered by a collective

22   bargaining agreement, and there's certain ramifications as to

23   benefits, et cetera.  So they track their hours, even though it

24   didn't matter, from their perspective, until your Honor ruled

25   against them, whether they worked 40, 50 or 60.

C26zmclc                    Conference

1        You may recall they got paid typically 50 or 60 hours.

2   They had sort of a salary, then they got this additional

3   compensation, EC, on a monthly basis which, arguably, was for

4   either overtime or a bonus, depending on how you looked at it.

5   Your Honor didn't feel it was for overtime or a bonus, and

6   ruled against us in that regard.

7        We never focused on, nor did we think it was relevant,

8   as to the actual hours worked, because they were exempt.  Your

9   Honor ruled against us.  We offered to Mr. Kahn to come see the

10  actual records.  And we've since produced some, about a third

11  of the managers' actual time records as a sampling to show when

12  they actually worked.

13       That's how we get to this issue today.  So when we had

14  payroll that showed 50 and 55 hours, that was because they

15  were, again, exempt and it didn't matter.  They actually worked

16  different hours, which was what we're suggesting to Mr. Kahn,

17  which we offered him to look at our actual records.

18       THE COURT:  Where did the hours come from that were in

19  the payroll records?

20       MR. WEBER:  They've been historic.  When you are a

21  manager, you got --

22       MR. KAHN:  That's not the case.

23       THE COURT:  Excuse me.  Don't interrupt.

24       MR. KAHN:  I'm so sorry.  I apologize.

25       MR. WEBER:  They had, simply had all these hours that

1   they put down for each garage for each manager, 50 or 55,

2   typically.

3           THE COURT:  But it wasn't a uniform number.

4           MR. WEBER:  Correct, your Honor.

5           THE COURT:  So where did the numbers come from?

6           MR. WEBER:  When you say the "numbers," the 50 and the

7   55?

8           THE COURT:  From the payroll records.  There were

9   differences in the numbers.

10           MR. WEBER:  The actual hours.

11           THE COURT:  No.  On the payroll records.  There wasn't

12   just a set number recorded.  It changed.

13           MR. WEBER:  Yes.  Some days they weren't -- they

14   didn't work, for example, for a week, there weren't any hours,

15   correct.

16           THE COURT:  Right.  They fluctuated.

17           MR. WEBER:  Correct.

18           THE COURT:  For an individual.

19           MR. WEBER:  Correct.

20           THE COURT:  Okay.  So what did those fluctuations

21   reflect?

22           MR. WEBER:  They were out for vacation, I think sick,

23   personal days.  I believe that's what they reflected.

24           THE COURT:  So you're saying their time was taken

25   account of in the payroll records to some extent, but not

C26zmclc                    Conference

1    completely.

2              MR. WEBER:  I'm not sure if it was -- when they didn't

3    work a week or a day, if it was for the benefit issued under

4    the collective bargaining or not, I'm not exactly sure why it

5    was reflected that way.  I know there, clearly there are weeks

6    when, or days when they weren't paid, so to speak, for either

7    vacation or sick or personal days, is my understanding.

8              THE COURT:  Okay.

9              When the issues with respect to the exemptions were

10   litigated before me, and certain documents were submitted in

11   connection with the summary judgment motion and certain

12   positions were taken by the parties, and it's my recollection

13   that at that time and in your, or in your motion papers the

14   defendants took the position that the payroll records reflected

15   the hours worked, including the overtime hours.

16             MR. WEBER:  Your Honor, I think we -- correct me, I

17   may be mistaken, I think we argued that they worked 50 or 55

18   for overtime purposes, plus the extra compensation to show that

19   they were exempt, not that those were the actual hours.  I

20   don't think anybody -- I don't think we said those are the

21   actual hours worked.  I could be wrong.  I have to look at our

22   submission.  I'm quite sure we --

23             THE COURT:  Okay.  I will want counsel to look at your

24   summary judgment papers and every other submission to the Court

25   before December 7th that reflects the position the defendants

C26zmclc                        Conference

1    have taken on this.  I know there was no suggestion that the

2    payroll records weren't reliable. as I noted in my opinion, and

3    this was what I understood the parties' position to be; that

4    is, both the defendants and the plaintiffs, that the payroll

5    records reflected the variations in wages based on the number

6    of hours worked during a pay period, and that the defendants do

7    not suggest that these records are inaccurate.

8           MR. WEBER:  I think we submitted documents that showed

9    the garage managers were scheduled for those hours, the 50 or

10   the 55, typically.

11          THE COURT:  Well, it will be interesting to look at

12   your motion papers, but I don't think that's how it was

13   presented.

14          And, in fact, I think what was presented was the

15   picture that people used time cards, and as a result people

16   punched in and punched out of work, and that the payroll

17   records reflected the actual hours worked.

18          There was a huge discussion, as I remember, whether or

19   not the deposits were made after hours or during the work day

20   and how close the depository was; so how much extra time it

21   would have taken to walk over and make the deposit at the, let

22   me say district office or whatever.

23          MR. WEBER:  Correct.

24          THE COURT:  And so the whole motion practice was

25   litigated in the context as if the payroll records included

C26zmclc                    Conference

1    every hour worked, not more, not less, but because of a system

2    that was in place.  And, as a result, my rulings applied what

3    the parties were in, as I understood it at that time, in an

4    undisputed way describing as the system that was in place to

5    record the actual hours worked by the employees, and everybody

6    made arguments based upon that record.

7            Now, the ruling that I issued in August, in some ways,

8    wasn't a surprise, since similar issues had been litigated in

9    the past for a different category of employees, as I remember

10   from the opinion.

11           MR. WEBER:  I'm not sure I understand that part, your

12   Honor.

13           THE COURT:  Let me see if I can find what I'm

14   referring to.  It's on page 16 of my opinion where I referred

15   to a Department of Labor investigation with respect to GMC's

16   practices in paying its parking attendants, where GMC had used

17   a bonus system there that was similar to the EC bonuses that

18   are at issue here.  So that's what I was referring to.

19           But, in any event, it seems to me, and I'll give

20   everybody a chance to pull together the briefing and the

21   discovery exchanges or whatever, prior to December 7th that

22   would have indicated that the defendants were or were not

23   taking a position that the payroll records reflected the hours

24   that the garage managers worked.

25           The implication of this I think is not small.  Because

C26zmclc                    Conference

1    we have, as set forth in the scheduling order from October, a

2    March trial date, March 12th, and the pretrial order is due

3    this month, February 17th, just days from now.  So it raises,

4    in my mind, whether it is fair to alert plaintiffs on

5    December 7th for the first time that the defendants are no

6    longer taking the position that the payroll records are

7    accurate, and that instead what's going to be necessary is for

8    the parties to engage in extremely burdensome and detailed

9    examination of the time cards.

10           Now, it sounds like the defendants have been doing

11   this for some time, and it is expensive and burdensome.

12           MR. WEBER:  We hope to get summaries, and we have

13   given summaries to Mr. Kahn on some of them.

14           MR. KAHN:  No, that's not correct, sir.

15           MR. WEBER:  On the 24 we gave you?

16           MR. KAHN:  No.  Your Honor, may I?

17           THE COURT:  So the plaintiffs would have a right to

18   investigate the time cards themselves and do your own analysis

19   and testing.  Time cards may or may not be accurate, of course.

20   I don't know if they're complete, and it raises a whole other

21   set of issues.

22           So this issue has the potential for transforming the

23   nature of this litigation, make it far more expensive and

24   burdensome for all at the end of the discovery period and the

25   end of the period, the period during which you would have

1  expected people to be focusing on preparing of the pretrial

2  order and getting ready for trial.

3        MR. WEBER:  We had offered Mr. Kahn that opportunity

4  to come in and look at the records sometime ago.

5        THE COURT:  Well, without indicating to him that it

6  was because you didn't think the payroll records were reliable

7  or accurate, no one would expect that you need to spend the

8  time and resources to look at the underlying time cards.  You

9  would use, in most systems, you know, the summary documents

10  which would be the weekly payroll records as opposed to daily

11  punch cards.

12        MR. WEBER:  You're using language, your Honor, that I

13  take exception to.  Mr. Kahn was very well aware of what

14  defendants' position was.  When your Honor ruled against us,

15  there was discussion with my colleague and Mr. Kahn about

16  coming in to see the actual punch -- the actual time records

17  because that's what our position is.  If we're going to be non-

18  exempt treated, if the manager is going to be non-exempt, you

19  have to look at the actual hours.

20        As your Honor noted, and it was -- it should have been

21  I think apparent, when there was an issue of when individuals

22  punched in and out of to drop off the cash receipts, that that

23  was what we looked at.  That's -- not they're going to be

24  non-exempt.  You have to look at when they worked.

25        I don't think it's as big a -- maybe it is -- but

1   we're certainly working on summaries so Mr. Kahn can look at

2   them and see them, that these are the actual hours worked.  I

3   don't think it's a surprise, and we certainly said come in and

4   look at them some time ago, after your Honor ruled.

5          THE COURT:  Okay, thank you.

6          Mr. Kahn.

7          MR. KAHN:  Yes, just a very few things, your Honor.

8          Mr. Weber has, I believe, told the Court in his

9   February 3rd letter that there are approximately 24,000 time

10  cards.  I have received a stack of time cards that's about

11  18 inches high.  I've not counted it, but it's far less than

12  24,000 people.

13         Even as recently as December 7, when Mr. Weber first

14  raised this defense, he had at that time said that they had

15  sampled time cards only of about a dozen employees.  So even as

16  recently as December 7, Mr. Weber's client hadn't done this

17  very work he's talking about.  This was clearly a new idea.

18         Certainly, as the Court noted, I was not at all

19  motivated to look at the time cards when there had been a

20  representation that the payroll records were accurate all

21  along.

22         I've also not received any summary or any indication

23  of what these, even this 18-inch stack of time cards means.

24  All I got was a cover letter from Mr. Weber, I believe on

25  January the 18th, although I'm not certain of the date, stating

1   here are some time cards from some employees, in substance.

2   And they weren't the complete time cards of any employee.

3   There was no indication of how these time cards fit into this

4   new theory.  There was never an offer to look at time cards for

5   this new theory until December 7.  Discovery closed I believe

6   last March, certainly many months before the summary judgment

7   motions.

8          THE COURT:  Well, that was with respect to, if I

9   remember correctly, the named plaintiffs.

10          MR. KAHN:  I think all fact discovery closed in March,

11   your Honor, I believe.

12          THE COURT:  Okay.

13          MR. KAHN:  Thank you, Judge.  And I'm sorry for my

14   heat, if it doesn't shed light.

15          THE COURT:  Okay.  So why don't we work on a schedule

16   where sometime this week counsel can pull together the prior

17   exchanges, either in response to discovery requests or in

18   connection with the motion practice in which there were

19   representations about the payroll records and the pay stubs,

20   which would or would not cause plaintiffs to understand that

21   these records that the defendants were taking the position that

22   these records reflected the actual hours worked.  And we'll

23   take a pause at the end of this conference for counsel to talk

24   with each other about when this week that would be convenient

25   for them to do.

C26zmclc                    Conference

1          Now, those are the two issues I have.

2          Let me just make sure that counsel don't have

3     something else.  Mr. Kahn?

4          MR. KAHN:  Not at this time, your Honor.  Mr. Weber

5     and I are discussing the admissibility of one piece of

6     evidence, but we haven't talked about that within the last

7     several weeks.  So I don't know that it would be fair to him or

8     to the Court to bring that to your attention.  Hopefully we'll

9     resolve it, but if not -- but that's a smaller issue, your

10    Honor.

11         THE COURT:  Okay.

12         MR. KAHN:  I would, your Honor, if I might just talk

13    about the schedule for a moment.  With this press of many new

14    things, your Honor, I don't know about Mr. Weber's firm, but

15    certainly I'm a little bit further behind where I thought I

16    would be with a preparation of the pretrial materials.

17         I'm wondering if the Court does not -- is not inclined

18    to put off the trial date -- and I would not object to that

19    being pushed back a short while, if the Court wanted to -- I

20    would hope that the Court might not be inconvenienced if we at

21    least put back the pretrial submission date.

22         So I guess I would ask for both, but be very happy to

23    get one, Judge.

24         MR. WEBER:  Your Honor, in that regard, I have a trial

25    before Judge Baer on March 12th, scheduled for March 12th as

C26zmclc                    Conference

1   well.  So I would join with Mr. Kahn in requesting an extension

2   of both the pretrial and the trial date.

3        MR. KAHN:  And I might just add one further thing,

4   your Honor.  My adversaries have always been very courteous to

5   me.  Elias, his family's expecting their first kid on about

6   March 1.  He's been the main attorney, besides Mr. Weber,

7   involved in this.

8        THE COURT:  Congratulations.

9        MR. ELIAS KAHN:  Thank you.

10       MR. KAHN:   I certainly wouldn't want to be

11  responsible for interfering.

12       MR. WEBER:  We appreciate that, Mr. Kahn.  And it

13  would maybe facilitate a number of issues, your Honor, if we

14  could adjourn the trial date for a month.

15       MR. KAHN:  Having said that, of course, we'll be

16  prepared on the 12th if your Honor wants.

17       THE COURT:  Okay.  Any other issue, Mr. Weber?

18       MR. WEBER:  No, your Honor.

19       THE COURT:  Okay, so we're going to go off the record

20  and just talk about scheduling for a moment.

21       (Off-the-record discussion)

22       THE COURT:  Back on the record.

23       Counsel and I have just discussed scheduling issues,

24  and we're going to have a hearing on February 14th at 2:00

25  p.m., at which Garage Management employees who spoke with

1    garage managers about the opt out issue or provided them

2    documentation with respect to the opt out issue will be

3    testifying.  It may be Mr. Isaac alone, it may be more than

4    Mr. Isaac.

5           And with respect to the parties' joint request that

6    the pretrial order and trial dates be adjourned, we've agreed

7    that the pretrial order documents will be due March 19th, and

8    the matters will be placed on the trial ready calendar for

9    April 2nd.

10          At our hearing next week we're going to discuss

11   whether this trial proceeds as a jury or non-jury matter.

12   We're going to talk about whether the McLean and Ramirez cases

13   proceed together on the same date.  That may be difficult if

14   one is jury and one is non-jury.  Counsel are going to discuss

15   with each other their respective positions with respect to

16   whether the trial should proceed as a jury or non-jury trial.

17          And then this Friday counsel will provide to the

18   Court, with a cover letter no longer than two pages, those

19   writings they exchanged before December 7th in which the

20   defendants did or did not lead plaintiffs to understand that it

21   was the defendants' position that the payroll records and pay

22   stubs accurately reflected the hours worked by garage managers.

23          Thank you, counsel.

24          MR. WEBER:  Thank you very much, your Honor.

25          MR. KAHN:  Judge, thank you so much.

C26zmclc                         Conference

1                (Adjourned)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25