C2EFGARH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HENRY McLEAN, et al,

                    Plaintiffs,

            v.                              10 CV 3950 (DC)

GARAGE MANAGE CORP., et al,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        February 14, 2012
                                        2:14 p.m.

Before:

                    HON. DENISE COTE,

                                        District Judge

                        APPEARANCES

KAHN OPTON, LLP
     Attorneys for Plaintiffs
STEPHEN H. KAHN


JUSTIN A. ZELLER, P.C.
     Attorneys for Plaintiff Ramirez
BRANDON SCHER


LITTLER MENDELSON, P.C.
     Attorneys for Defendants
A. MICHAEL WEBER
ELIAS J. KAHN

C2EFGARH

```
 1              (Case called)

 2              (In open court)

 3              THE DEPUTY CLERK:  McLean v. Garage Management.

 4     Counsel, state your appearances for the record.

 5              MR. S. KAHN:  For plaintiff in the McLean suit,

 6     Stephen H. Kahn, Kahn Opton LLP.

 7              MR. RICHTENTHAL:  For Mr. Ramirez in the related

 8     action, Brandon Scher from the law office of Justin A. Zeller.

 9              MR. WEBER:  Good afternoon, your Honor.  Michael Weber

10     and Elias Kahn on behalf of the defendants on both matters.

11              THE COURT:  You're assisted at counsel table by whom,

12     Mr. Weber?

13              MS. HERZBERG:  Alissa Herzberg.

14              MR. WEBER:  And two witnesses, your Honor, for the

15     defendants.

16              THE COURT:  Okay.  Why don't we put the two witnesses

17     in the witness room.  I'll ask my deputy to do that.  Good.

18              So, counsel, I want to thank you for your submissions

19     of February 10th.  I've read them.  My chambers called counsel

20     this morning to request that you fill in some dates that would

21     be associated with the exhibits that were attached.  I think

22     this principally concerns dates that were missing, at least I

23     didn't see them in the plaintiff's submission, so let's just

24     walk through those.  For Exhibit A, what is that date?

25              MR. S. KAHN:  That date is the date of defendant's
```

1    supplemental response.  It is December 7, 2010.  Your Honor, I

2    have documents that substantiate all of this if the Court wants

3    them.

4           THE COURT:  Only if it ends up being a matter of

5    dispute.  I expect it won't be.  And then you make reference to

6    a document request number 5.

7           MR. S. KAHN:  Yes.  That was received by my office

8    under cover of letter from defense counsel dated December 15,

9    2010.

10          THE COURT:  And then there are documents which are

11   associated with Exhibits C and D that were received in

12   connection with summary judgment practice?

13          MR. S. KAHN:  Yes, your Honor.  Exhibit C refers to

14   GMC defendant's response to plaintiffs' statement of material

15   facts and the date of defendants' response was May 13, 2011.

16   Exhibit D refers to defendants Rule 56.1 statement on its

17   summary judgment motion and that was dated April 22nd, 2011 and

18   if I might jump ahead, the Weinstein transcript exhibit was

19   from a deposition of Mr. Weinstein conducted on March 2, 2011.

20   And if your Honor would permit, I did discover one other

21   relevant transcript section.  I would like to hand it up if the

22   Court would find it helpful.

23          THE COURT:  Have you given it to defense counsel?

24          MR. S. KAHN:  I will do so immediately.  Your Honor, I

25   am handing up from the deposition of Douglas Kamm, who I

1    believe will be a witness here today later in this hearing, an

2    excerpt from his March 11, 2011 deposition exhibit.  I

3    particularly direct the Court's attention to page 13, where

4    there is a several-question exchange regarding how time records

5    are compiled.  And if I might hand that page up, your Honor?

6    Thank you.

7          While I'm handing things up, your Honor, you had also

8    directed me to submit --

9          THE COURT:  Kamm is K-a-m-m.

10         Okay, Mr. Kahn, you wanted to say something further?

11         MR. S. KAHN:  Yes, not with regard to this topic, but

12   while I am delivering documents, you also requested that I

13   provide the Court with an affirmation of mailing of the

14   requested opt out notice and exclusion form.  I've given a copy

15   to Mr. Weber of my affirmation of mailing.  If I may hand that

16   up also.  Thank you, Judge.

17         THE COURT:  Counsel, I have reviewed the materials

18   associated with the issue about the time cards, and just to put

19   this in context, fact discovery in this case closed at the end

20   of March in 2011.  There was litigation over a motion to

21   dismiss and to require arbitration.  There was litigation

22   associated with cross motions for summary judgment.  The

23   pretrial order is due March 19th and this case is set to be

24   tried in April.  So it is in that context that we are

25   discussing whether or not the plaintiffs were sufficiently on

1    notice that the time cards would be relied upon by the

2    defendants to calculate any overtime pay in this case or

3    whether the defendants during the litigation or during enough

4    of the litigation took the position that the payroll records

5    which were kept by a company called Paychex, or at least

6    through a system created by a company called Paychex were the

7    documents that the defendants felt were the records on which

8    they were going to rely for the actual hours worked, such that

9    the plaintiffs did not have sufficient notice from the

10   defendants that they had to separately inspect the time cards.

11           I've received the parties' submissions.  We've talked

12   about this briefly at a prior conference or two.  I'm prepared

13   to rule on this issue, but I want to make sure nobody has

14   anything that they want to say in addition to what they've

15   already submitted to me.

16           Mr. Kahn?

17           MR. S. KAHN:  Yes, your Honor.  I would just like to

18   advise the Court that although we've been calling this the time

19   card issue, I don't think GMC really means to dump 24,000 time

20   cards in the courthouse.  I think what they're really concerned

21   about is putting their summary or analysis of these time cards

22   in the courthouse.  I've still not received a copy of this

23   analysis, although I've been asking for it for some time which

24   leads me at least to infer that this is still a work in

25   progress.  I don't even think it's done which shows how recent

1    this invention in this litigation is on GMC's part.

2             I'd also like to point out, and I waited to make this

3    point until I reviewed Mr. Weber's submissions to be fair to

4    him to be sure I hadn't overlooked anything, but GMC's summary

5    judgment motion was devoid of any mention whatsoever of the

6    distinction between time cards and payrolls.  Certainly if they

7    identified this as an issue at the time of the summary judgment

8    motions, this is a point they would have made in support of

9    their argument that the garage managers were salary basis

10   employees.

11            So I think there's a great deal of evidence that shows

12   that GMC has just discovered or invented this defense itself

13   which means of course the plaintiffs could not have had notice

14   of it in any timely fashion.  Thank you so much.

15            THE COURT:  Mr. Weber, is there anything you wanted to

16   say in addition to what you've already conveyed to the Court?

17            MR. WEBER:  With respect to Mr. Kahn's comment, your

18   Honor, as your Honor is well aware defendants' position has

19   been all along that the managers were all exempt and that they

20   were paid a salary.  The actual time records and actually the

21   transcript from Mr. Kamm just submitted supports defendants'

22   position that Mr. Kahn was well aware that they're actually

23   paid based on the hours they worked and they worked more.  But

24   the point is all along and we obviously still believe this to

25   be the case, managers were exempt, we believe they are exempt

 1   and they were paid salary plus extra compensation.  The actual

 2   time records were relevant for that purpose.  In reality, the

 3   actual time they worked is very relevant for a couple of

 4   reasons.  One, the benefit they received from the union

 5   contract.

 6          As your Honor is aware, the management is covered by a

 7   collective bargaining agreement.  That document is attached to

 8   a moving affirmation in support of summary judgment.  The

 9   defendants argued that they had to keep actual hours, time

10   records for benefit purposes for pension and welfare

11   contributions.  The defendants were obligated to pay only on

12   the hours worked, which is why the time records reflected

13   actual time, hourly rate and hours worked.  Nevertheless,

14   defendants had always taken the position they're exempt, they

15   were paid a salary, they performed exempt duties and therefore

16   they're exempt under the law.  But certainly Mr. Kahn was aware

17   even based on the transcript of Mr. Kamm that he just submitted

18   they did get paid more and there were variations in the time

19   records.

20          But I think the plaintiff was always on notice that

21   there are actual time records and clearly if we lost the

22   argument before your Honor that the managers were exempt we

23   would obviously look to the actual hours worked.  That's the

24   law.  That's what the regulations say, that's what the law

25   says.  I don't think he can say he's not aware of that argument

1    or the fact that they existed or that witnesses testified that

2    they clocked in and they clocked out.  I don't think there's

3    any prejudice here whatever so far to Mr. Kahn and certainly

4    we've got a month or two if he needs documents and summaries to

5    look at them, to provide that information.

6             THE COURT:  Okay.  Now.  Just to be precise, and I

7    don't want to suggest that you weren't, but just to make sure I

8    wasn't misled by anything that you said because I failed to

9    understand the terminology you were using, the records of the

10   hours worked, the time records are the payroll records that are

11   maintained through the Paychex system.

12            MR. WEBER:  No, your Honor.

13            THE COURT:  So when you held up the collective

14   bargaining agreement, that document for me to look at and said

15   that you were required to keep track because of the collective

16   bargaining agreement of the hours worked, are you telling me

17   you didn't do that through the Paychex system?

18            MR. WEBER:  Not to my knowledge, your Honor.

19            THE COURT:  So what system did you use if it wasn't

20   the payroll system reflected in the Paychex system?

21            MR. WEBER:  To my knowledge, your Honor, there are

22   separate reporting obligations that GMC followed with respect

23   to reports to the union vis-a-vis welfare contributions and

24   pension contributions.  The collective bargaining agreement

25   provides a set hourly amount -- excuse me, a dollar amount to

1     be paid per hour worked.

2              THE COURT:  And what records -- are those monthly

3     records that were given to the union?

4              MR. WEBER:  I believe so, your Honor.

5              THE COURT:  And they were different monthly records

6     than the payroll records that were provided in the course of

7     discovery?

8              MR. WEBER:  That is my understanding, your Honor.

9              THE COURT:  And you've never provided those records to

10    the plaintiff?

11             MR. WEBER:  No, your Honor.  The records that I'm just

12    referring to submitted to the union --

13             THE COURT:  Yes.

14             MR. WEBER:  Those records?  No.

15             THE COURT:  What are those records called?

16             MR. WEBER:  I'm not certain, your Honor, but I believe

17    they would be welfare and pension contribution reports

18    reflecting the hours worked for each employee each month, the

19    amount of the required contribution that varied per year and a

20    total amount, a dollar amount that would be paid, a

21    contribution paid on behalf of the employee.

22             THE COURT:  Okay.  So let's call those the collective

23    bargaining agreement hourly records, just so we're talking

24    about something we can all agree on at least in terms of

25    terminology.  Are you contending that the collective bargaining

1    hourly records are different than the Paychex hourly records?

2              MR. WEBER:  Absolutely.

3              THE COURT:  And you've done that comparison?

4              MR. WEBER:  I haven't, your Honor, but I know they

5    have to be different.

6              THE COURT:  And you know that because?

7              MR. WEBER:  I'll tell you why.  I believe, your Honor,

8    there is a cap on the number of hours.  On page 32 of the

9    collective bargaining agreement there is a provision that says

10   contributions in this case to the welfare plan shall be made

11   for all hours employees are required to be paid for no more

12   than 40 hours per week.

13             As your Honor knows, the Paychex records reflected

14   either 50 or 55 hours that managers were paid, that they worked

15   in each garage.  It varied depending on the garage and the

16   manager.  So the salary was for those hours worked and as your

17   Honor recalls the company paid the extra composition monthly as

18   a precaution to in fact overpay them for any potential overtime

19   finding.  So the contract required a set salary.  The company

20   paid more than that salary per week and then paid more than

21   that on the extra compensation monthly.

22             But as far as the contributions go, the collective

23   bargaining paid record, there is a cap of 40 hours.  So they

24   never would pay 50 or 55 as the Paychex records reflect.

25             Now, Mr. Kahn --

1          THE COURT:  One minute.  Are you saying, then, that

2     while the Paychex record for a particular employee might

3     reflect 50 hours of work on a particular week, the collective

4     bargaining agreement payroll records would only reflect at most

5     40 hours?

6          MR. WEBER:  Exactly, your Honor.

7          THE COURT:  Okay.  So you are not contending that the

8     collective bargaining agreement payroll records would be an

9     accurate reflection of the hours worked?

10         MR. WEBER:  Yes, I would, your Honor.  And Mr. Kahn's

11    clients knew exactly -- in fact, some of them were union

12    representatives.  They knew exactly what contributions were

13    being made on their behalf.  So if they worked 35 hours one

14    week there would be contributions made to pension and welfare

15    funds for 35 hours.

16         THE COURT:  Right.  But under the hypothetical, which

17    is the more customary hypothetical here, for somebody who

18    worked 50 or 60 hours a week, the Paychex records are going to

19    reflect 50 or 60 hours a week, but the collective bargaining

20    agreement submission, its payroll record, will only reflect 40

21    hours a week.  Do I understand correctly what you're saying to

22    me?

23         MR. WEBER:  One caveat, your Honor.  Up to 40 hours.

24    So it's the actual hours worked with a 40 cap.  The --

25         THE COURT:  Yes, our hypothetical is the employee

```
1    actually worked 50 hours a week and that's what's shown in the

2    Paychex payroll record.  What number is going to be shown in

3    our hypothetical for the collective bargaining agreement

4    payroll record?

5              MR. WEBER:  40 hours.

6              THE COURT:  Okay.  So that 40 hours in the collective

7    bargaining agreement payroll record is not the number of actual

8    hours worked because of the cap in the collective bargaining

9    agreement, is that right?

10             MR. WEBER:  With one exception, your Honor.  The

11   Paychex payroll record that reflected 50 hours didn't

12   necessarily mean the manager worked 50 hours.  If your

13   hypothetical is if they worked 50 hours, that's correct, your

14   Honor, it would only reflect 40 hours for contribution purposes

15   under the collective bargaining agreement.

16             THE COURT:  Okay.  So we cannot rely on the collective

17   bargaining agreement records to reflect actual hours worked

18   because there was a cap that was placed on those reports.

19             MR. WEBER:  That's a fair statement, your Honor.

20             THE COURT:  And you never identified those reports as

21   being, to the plaintiffs during this litigation, as reflecting

22   the actual hours worked.

23             MR. WEBER:  What we argued, your Honor, in our

24   motion --

25             THE COURT:  No, no, no.  In discovery you never
```

```
 1    identified to the plaintiffs or in the motion practice you

 2    never identified to the plaintiffs that the collective

 3    bargaining agreement reports were the most accurate record of

 4    the actual number of hours worked.

 5              MR. WEBER:  We wouldn't, nor would it be accurate to

 6    say that.

 7              THE COURT:  Okay.

 8              MR. WEBER:  We wouldn't make that representation.  It

 9    wouldn't be accurate.

10              THE COURT:  Okay.  Good.  I just wanted to make sure I

11    understood your argument.

12              MR. WEBER:  But, your Honor, we did make the argument

13    and we did attach the collective bargaining agreement to our

14    papers as to why there were hourly rates on the payroll records

15    and that we were obligated to make contributions based on hours

16    worked.  That was in our submission in summary judgment.  So

17    plaintiff is well aware of those arguments.  We wouldn't, as

18    your Honor obviously observed, we wouldn't make the argument

19    those were actual hours, but we did make it as to why the

20    hourly rates were on documents.  Your Honor would think, well,

21    if they're salaried employees why do you have an hourly rate on

22    the documents.  I think that was probably a factor in your

23    Honor's thinking.  And my argument is because they are covered

24    by a collective bargaining agreement.  They're obligated.

25              THE COURT:  I understood that then, that that was your
```

1    argument and explanation in connection with the summary

2    judgment practice.

3          MR. WEBER:  And I've not been successful in persuading

4    your Honor, but I keep trying.

5          THE COURT:  Good.  Good.  Thank you.

6          MR. WEBER:  One more point, your Honor, and it goes to

7    the hearing we're about to have.

8          THE COURT:  Sure.

9          MR. WEBER:  This is a fairly comprehensive document.

10   Mr. Kahn's clients are represented by a union.  They have all

11   kinds of protections here with respect to grievances and

12   arbitrations and protections for any bad behavior by an

13   employer and as your Honor may imagine, the plaintiffs are not

14   shy.  They are well represented by Mr. Kahn and well

15   represented by the union.  There are lots of protections here

16   and I just want to highlight that for our discussion here

17   that's about to take place.

18         THE COURT:  Good.  Thank you.  And before we get to

19   that part of the hearing which addresses a separate issue and

20   that is to the reliability of the opt out notices, I just

21   wanted to bring to a conclusion the issue about the time cards.

22   And Mr. Weber, you did indirectly respond to Mr. Kahn's point

23   that he made orally today and I guess at our last conference,

24   and I just wanted to give you a chance, since I may have

25   interrupted what you had planned to say, and that is that you

1    still have not given him the summary of what you think the

2    actual hours are that were worked by the individual employees.

3            MR. WEBER:  Your Honor, we've given him about a third

4    to 40 percent of the time cards.  As Mr. Kahn observed, there's

5    tens of thousands of these documents and when your Honor ruled

6    against us, the client has been in the process of trying to go

7    through 24 some-odd thousand documents to provide a summary, so

8    we've been able to give him about a third of the documents so

9    he has a sense of them and they've been constantly working on

10   the others and we hope to have them virtually in the next few

11   days, your Honor.

12           So he has a summary of about a third, he knows what

13   they look like.  He's shaking his head, but I believe that's

14   the case.

15           THE COURT:  Okay.  So when you say you've given him a

16   summary of a third, does that mean that a third of the

17   employees for the period of time at issue, you have summary

18   reports on what basis; two weeks, a month, of the hours worked?

19           MR. WEBER:  Six years, your Honor.

20           THE COURT:  But are they monthly?  How are the hours

21   aggregated in that summary report?

22           MR. WEBER:  My colleague Mr. Kahn had done this, so

23   I'm asking him that question.

24           THE COURT:  Good.  Mr. Kahn, I'll hear directly from

25   you.

```
1              MR. WEBER:  He says weekly, your Honor.

2              THE COURT:  Okay, Mr. Kahn.  Thanks so much.  I know

3    you've been working hard on this.

4              MR. E. KAHN:  Thank you, your Honor.  Yes.

5              THE COURT:  So what have you been able thus far to

6    produce and hand over to the plaintiff?

7              MR. E. KAHN:  Thus far we've been able to produce

8    summaries of I believe 24 of the plaintiffs and they do contain

9    weekly reports comparing how many hours they worked on the time

10   cards versus the payroll records.

11             THE COURT:  And so you've done that, okay, you've just

12   told me about 24 employees?

13             MR. E. KAHN:  That's correct.  From our client, I

14   believe that the analysis is either virtually all done or

15   completely done.  It takes a lot of time to do this project,

16   it's not something they just figured out and can slap together

17   in a day.  They've been spending many, many weeks putting this

18   together and putting together this analysis and it should be

19   all ready soon is what they've informed me.

20             THE COURT:  Good.  Thank you so much.  Mr.  -- the

21   other Mr. Kahn.

22             MR. S. KAHN:  Too many Kahns in the courtroom, your

23   Honor.

24             Your Honor, what Mr. Elias Kahn said is not correct.

25   All that I received, and I received it about two weeks ago, is
```

1     a stack of time cards of approximately 18 inches high which I

2     haven't counted but is clearly not a third of 24,000 time cards

3     with no analysis.  I just received time cards rubber banded

4     together in a box.  I've received no analysis.  Defendants

5     told -- in a footnote to their December 7 letter to Judge

6     Gorenstein -- said that they were conducting, I believe the

7     expression they used was an extensive analysis.  All I've

8     received are 18 inches of time cards from some employees that

9     mean absolutely nothing to me other than there are time cards

10    which I already did know.

11              THE COURT:  Good.

12              MR. E. KAHN:  Your Honor, I do believe we did give him

13    the 24 Excel sheets.  I believe we handed it to him.

14              MR. S. KAHN:  No.

15              MR. E. KAHN:  I believe we did.

16              THE COURT:  Do you have a cover letter, Mr. Kahn?

17              MR. E. KAHN:  It was in person.

18              THE COURT:  You personally handed it over?

19              MR. E. KAHN:  That's my recall.  But again, I can

20    give -- if that is not the case I'll give them to him right

21    away.  I thought I did hand them to him, your Honor.

22              THE COURT:  Okay.  Why don't you create a cover letter

23    or memorial e-mail or something when you make the transmission?

24              MR. E. KAHN:  Sure.

25              THE COURT:  Good.  So that there's a record of date of

1    delivery and who delivered what to whom.

2            MR. E. KAHN:  Yes.  We can do that today.

3            THE COURT:  Thank you so much.  Okay.  So here,

4    counsel, is my analysis of what we have.  I very much

5    appreciate that the defendant is taking the position that the

6    payroll records, which I've referred to as the Paychex records,

7    were never meant to indicate the actual number of hours worked

8    by an individual garage manager.  That's their position now.

9    And Mr. Weber has explained that the defense in this case, the

10   system of making payments and the EC bonus system and the way

11   that that system of payments and the EC bonuses worked was in

12   part driven by the collective bargaining agreement rights and

13   this company's practice within this industry.

14           The issue for me is a different one.  This case was

15   filed in 2010.  Its related case was filed earlier, but I'm

16   just going to focus now on McLean.  McLean was filed in 2010

17   and there was a period of discovery, fact discovery that was to

18   end in late January of 2011 but ultimately was extended to late

19   March of 2011.  And during that period of time when the parties

20   were conducting fact discovery of each other, it was of course

21   the plaintiff's position, well known to the defendants, that

22   there was a violation here of the FLSA and the New York Labor

23   Law, and that there was a failure to pay overtime and other

24   violations.

25           The plaintiffs made demands for documents.  They

1    placed interrogatories, they made document requests, they

2    negotiated production through e-mail correspondence and

3    otherwise, and during the course of that history of fact

4    discovery through the submissions of the parties that had been

5    made to me, including the interrogatory answer of December 7,

6    2010, the response to the document request in December of 2010,

7    the January and February 2011 e-mail correspondence, repeatedly

8    the defendant told the plaintiffs that the records that

9    reflected the hours worked of the employees was the Paychex

10   system.  There was nothing said that would reflect that they

11   were an unreliable record of the number of hours worked.  And

12   of course that was important for the plaintiff to know because

13   its damage calculations would be driven with respect to the

14   number of hours actually worked each week by each plaintiff.

15        It had its theory of a violation of the law.  The

16   defendants had their theories of the violation of the law, but

17   both sides needed to figure out what were the actual number of

18   hours worked and then you apply your legal arguments to it and

19   develop your surrounding evidence in relationship to it.

20        And while the defendant made the time cards available

21   for inspection, it never put the plaintiffs on notice that it

22   was the defendant's position that the Paychex records were

23   unreliable and only the time cards could actually reflect the

24   precise numbers of hours worked.

25        This analysis continued through the deposition

1    testimony taken in March.  It continued through the summary

2    judgment presentations in April and May.  Over and over again

3    it was described to the plaintiffs that the Paychex system,

4    those payroll records, reflected the actual number of hours

5    worked, and the defendant relied on the numbers of hours worked

6    from the Paychex system to do calculations.

7         The first time that the defendant took the position

8    that the Paychex system may not reliably reflect the number of

9    hours worked was apparently in a November 14, 2011 letter to

10   Judge Gorenstein, although it may have been even later, a

11   December 7, 2011 letter to the plaintiff.

12        From this history I conclude the following:  Both the

13   plaintiffs and the defendant knew that there was a system in

14   which garage managers would punch a time clock.  Both sets of

15   parties knew that the defendant kept payroll records.  The

16   defendants took the position from the beginning of the

17   litigation and throughout fact discovery that those payroll

18   records that were part of the Paychex system were reliable

19   records of the hours actually worked.  The plaintiffs had

20   access to the time cards, but no incentive to look at them

21   because it was reasonable for them to rely on the defendants'

22   representation that the Paychex payroll system reflected the

23   actual number of hours worked from the defendants' perspective.

24        Then, of course, in my late August opinion I rejected

25   the exemption argument being made to me by the defendant.  I

1    ruled, among other things, that the EC bonuses were not

2    overtime payments as required by law.  So it appears that

3    sometime thereafter, certainly by November, the defendant

4    started to engage on what is and has been described to me today

5    as a massive undertaking to look at individual time cards to

6    see the extent to which they do or do not match the Paychex

7    payroll records.

8        It seems to me that it's too late in the day to put

9    the burden on the plaintiff with discovery long over, ending

10   last March, to invest its time and energy in doing this

11   extraordinarily burdensome project that the defendant is now

12   undertaking.  And therefore, I'm going to bar from trial

13   evidence that the time cards reflect fewer hours than the

14   Paychex payroll records.

15       MR. WEBER:  And if I may, obviously, we take exception

16   to the ruling, but I just want to clarify a point.  Throughout

17   our position the defendants have taken a position that their

18   managers are exempt so the extra hours are irrelevant, they're

19   irrelevant.  I don't think we ever said they actually worked 50

20   or 55 because that's what the Paychex records said.  It

21   couldn't say that, it wouldn't be accurate.

22       However once you ruled and once we realized we were

23   going to face a damage trial the actual hours became relevant

24   and assuming November was the first time Mr. Kahn was aware of

25   it, he will have six months between then and trial to focus on

1    that issue.  We're doing all the work and the summaries, so I

2    don't think the burden is on the plaintiff but it's clearly on

3    us to make our case as to what are the actual hours worked.

4           THE COURT:  So, Mr. Weber, I have ruled and the record

5    as created by the parties' submission is different, I think,

6    than what you describe.  The defendants did repeatedly describe

7    the Paychex records as reflecting the actual hours worked.  So

8    I don't want to argue with you, Mr. Weber.  We have other

9    things to do this afternoon.

10          Mr. Kahn?

11          MR. S. KAHN:  May I just for the sake of completeness

12   add one brief point to which the parties will agree?  We've

13   been referring to the payroll records as the Paychex records.

14   There was a brief period of time before Paychex began to

15   administer GMC's records that very similar payroll records were

16   maintained in-house by GMC.  I don't think in any way that

17   affects any argument that the parties have made, which is why

18   the parties haven't pointed this out to the Court before.  We

19   were remiss, but I did want to note that on the record, your

20   Honor.  Thank you.

21          THE COURT:  Okay.  So, let's turn to the topic for

22   today, and, Mr. Weber, the did you want to describe the two

23   witnesses and then make a brief proffer with respect to what

24   evidence they have to offer?

25          MR. WEBER:  Yes, your Honor.  We'd like to call two

```
 1   witnesses today.  Mike Isaac is a supervisor for defendant GMC.
 2   Part of his job is not only supervising the garage managers but
 3   he frequents every garage weekly to do audits and spot checks
 4   and talk to managers, so he can speak firsthand as to the issue
 5   that's before your Honor, whether there was coercion, how it
 6   came about that managers chose to opt out.  So he's the front
 7   line person that can address those issues.
 8          The second person is Douglas Kamm.  Mr. Kamm is really
 9   in charge of human resources and payroll and payment-related
10   issues.  Was with the company from 1986 to 2000 and then back
11   again in 2010 and he's been very involved in these issues as
12   well.  So those are two witnesses we'd like to present today,
13   your Honor.
14          THE COURT:  Is it Mr. Isaac who had the direct
15   conversations with the individuals who opted out?
16          THE WITNESS:  Correct, your Honor.
17          THE COURT:  And did Mr. Kamm have direct conversations
18   with any of those individuals?
19          MR. WEBER:  I think one or two, but primarily with Mr.
20   Isaac and he can give sort of an overview as the company
21   representative as to what happened.
22          THE COURT:  So should we start with Mr. Isaac?
23          MR. WEBER:  Yes, your Honor, I'd like to.
24          THE COURT:  Good.
25          MR. WEBER:  May I?
```

1          THE COURT:  You may bring him or should I ask the

2     deputy?  You can get him?  Thank you.

3      MICHAEL ISAAC,

4          called as a witness by the Defendants,

5          having been duly sworn, testified as follows:

6          THE COURT:  Counsel.

7     DIRECT EXAMINATION

8     BY MR. WEBER:

9     Q.  Mr. Isaac, where are you employed?

10    A.  Garage Management Corporation.

11    Q.  What is your current title?

12    A.  Field supervisor in charge of the operation.

13    Q.  And how long have you been employed by GMC?

14    A.  25 years.

15    Q.  What was your first position when you started?

16    A.  I started as a supervisor working under the supervisor in

17    charge at the time.

18    Q.  In your current position what are your day-to-day job

19    responsibilities?

20    A.  It varies from doing the budget for the garages, payroll,

21    marketing.  I mean, the whole operation.  Maintenance.

22    Q.  Does your job require you to be out in the field visiting

23    garages on a regular basis?

24    A.  Yes, it is.

25    Q.  Could you describe what your day-to-day responsibilities

1    are vis-a-vis the garage managers?

2    A.  I confer on a daily basis with the managers regarding the

3    problems that pertain to the garage; staffing, business,

4    regular operation.

5    Q.  And how many managers are you supervising at the current

6    time?

7    A.  63.

8    Q.  Do you have a practice of visiting garages on a weekly

9    basis?

10   A.  Yes.

11   Q.  What is that practice?

12   A.  I cover about 12 garages on a daily basis.

13   Q.  How many, I'm sorry?

14   A.  12.

15   Q.  Is that approximately one garage per week each week of the

16   month?

17   A.  Correct.

18   Q.  And when you go to each garage, what do you do when you go

19   there?

20   A.  It varies.  I do audits, I check the garage, physically

21   check to see whether the cars have tickets, that the monthlies

22   correspond with the accounts receivable system; walk the

23   neighborhood, see the competitors and all that.

24   Q.  Do you actually see each garage manager on each visit?

25   A.  Yes.

1          THE COURT:  I'm sorry, Mr. Weber.  Could you review

2     again how many visits that is with an individual garage per

3     month?

4          MR. WEBER:  Well, your Honor, as I understand Mr.

5     Isaac's testimony, there's about 63 garages under his

6     supervision.  He visits 12 a day or 60 some a week.  My

7     understanding, correct me, Mr. Isaac, if I'm wrong, that he

8     visits each garage once a week.

9     Q.  Is that correct, Mr. Isaac?

10    A.  Yes, it is.  Yes.

11         MR. WEBER:  Your Honor, does that clarify the

12    question?

13         THE COURT:  Yes.  Thank you so much.

14    Q.  Let me direct your attention to the purpose of today's

15    hearing.  Did you become aware at some point about this lawsuit

16    that was filed on behalf of garage managers?

17    A.  Yes, I did.

18    Q.  And were you aware that it had to do with a question of

19    whether they were entitled to overtime or not?

20    A.  Yes, I did.

21    Q.  And were you aware that this was being treated as a class

22    action?

23    A.  Yes, I did.

24    Q.  And did you become aware at one point in time whether there

25    was a question of whether the managers understood that they had

1  a right to opt out of the case?

2  A.  Yes.

3  Q.  And tell me how you became aware of that understanding.

4  A.  There were -- we were contacted, I was contacted by one of

5  the garage managers that received the opt-out letter.

6  Q.  Who contacted you?

7  A.  His name is Arnold Herrera.

8  Q.  And when did Mr. Herrera contact you?

9  A.  At the beginning of January, first week of January.

10  Q.  And what did he say to you, if you can recall?

11  A.  He said that he had received a letter from the office of

12  Mr. Kahn.

13         MR. S. KAHN:  I'm sorry, had or had not?

14         MR. WEBER:  I think he said he had received.

15  A.  Had received a letter.

16  Q.  From Mr. Stephen Kahn's office?

17  A.  From Mr. Stephen Kahn's office, there was a form in it to

18  either stay in the lawsuit or to opt out of the lawsuit.

19  Q.  And why was he calling you?

20  A.  He told me that he received it and there were, when he

21  spoke to a couple of his friends, the other managers, that they

22  had said that they did not receive the same form.

23  Q.  They did not receive the same form?

24  A.  They did not receive the same form, correct.

25  Q.  What was the purpose of Mr. Herrera's call to you?

1              MR. S. KAHN:  Objection.

2              THE COURT:  Sustained.

3    Q.  If you know.

4              THE COURT:  Sustained.

5              MR. WEBER:  I'll restate that.

6    Q.  Did Mr. Herrera state why he was calling you?

7    A.  Yes.  He said that when he spoke to the other guys, they

8    were asking him why they didn't receive the same form.

9    Q.  And what if anything did you say to Mr. Herrera?

10   A.  I told him I didn't know anything about it, I'll check with

11   the office to see and I would get back to him.

12   Q.  And what did you do next?

13   A.  I spoke to Doug Kamm at the office and made him aware of

14   the situation.

15   Q.  And what if anything did Mr. Kamm say to you?

16   A.  He said he would speak to Gordon, Gordon Hamm, and once he

17   got an answer he would get back to me.

18   Q.  And did there come a time when you spoke to Mr. Kamm again?

19   A.  Yes, I did.

20   Q.  Do you know approximately when that was?

21   A.  I would say about the second week around the 15th probably.

22   Not exactly.

23   Q.  And do you recall what Mr. Kamm said to you?

24   A.  He said that Gordon Hamm had gone to the court to get

25   advice from the judge to see how we approach the situation with

C2EFGARH                          Isaac - direct

1   the letter.

2   Q.  And what if anything did you do after speaking to Mr. Kamm

3   regarding that conversation?

4   A.  Once -- after he told me that, I waited to see what the

5   decision was and I got a call from him a couple of days later

6   and said that Gordon Hamm was at the court and the judge had

7   instructed us to provide the letters to the managers that ask

8   for it.

9   Q.  To provide letters to the managers that asked for them.

10  A.  Correct.

11  Q.  And what if anything did you do next regarding providing

12  information to managers?

13  A.  I didn't speak to them back, but Doug Kamm spoke to Arnold

14  afterwards.

15          THE COURT:  Excuse me.  Who spoke to whom?

16          THE WITNESS:  Doug Kamm, director of personnel.

17          THE COURT:  Spoke to whom?

18          THE WITNESS:  To Arnold.  Arnold had called Doug

19  again --

20          THE COURT:  To --

21          MR. WEBER:  Arnold Herrera, your Honor.

22          THE COURT:  Thank you.

23          MR. WEBER:  One of the garage managers that Mr. Isaac

24  mentioned before.

25  Q.  Did there come a time when Mr. Herrera or anyone else

1  called you regarding the forms that we're talking about?

2  A.  No.

3  Q.  Did there come a time when you had any conversations with

4  managers about the exclusion forms that we're talking about?

5  A.  Can you repeat that again?

6  Q.  Sure.  In the process of your job in visiting garages, did

7  there come a time when any manager spoke to you about the

8  exclusion forms?

9  A.  Yes, there did.

10  Q.  And when was the first time you had a conversation with a

11  manager about the exclusion forms?

12  A.  After Doug Kamm had received the forms he made copies of

13  the packages and had asked me to deliver the packages to Arnold

14  who had asked for them and Javier Sanchez, that's the manager

15  that called Doug on the same subject.

16  Q.  Mr. Kamm told you that these two garage managers had asked

17  for the package?

18  A.  Correct.

19  Q.  Relating to the exclusion?

20  A.  Correct.

21        MR. S. KAHN:  Could I have that second name again?

22  I'm sorry.

23  Q.  Could you mention the second name?

24  A.  Javier Sanchez.

25        MR. S. KAHN:  Thank you.

C2EFGARH                         Isaac - direct

1   Q.  This was approximately in January of this year?

2            MR. S. KAHN:  Objection.

3            THE COURT:  Sustained.

4   Q.  When approximately did you speak to Mr. Sanchez or

5   Mr. Herrera about the package?

6   A.  The second week of January.

7   Q.  Did there come a time when you met with Mr. Herrera and/or

8   Mr. Sanchez and provided the package they were talking about?

9            MR. S. KAHN:  Objection.

10           THE COURT:  Overruled.

11  A.  Yes.

12  Q.  When was that?

13  A.  That was January, it might have been January 18th.

14  Q.  Can you tell me what you said to Mr. Herrera, for example,

15  concerning the package?

16  A.  When I went to both of them, I told them these are the

17  forms that you asked for.

18  Q.  What if anything did they say in response?

19  A.  Well, they said thanks, and they asked me that there were

20  other managers that had asked for more forms, for the same

21  forms.

22  Q.  They said to you that managers said to them --

23  A.  That they needed more forms to give to all the managers

24  that asked for them.

25  Q.  Did you give them the forms?

1    A.  Yes, I did.

2    Q.  Do you know approximately how many forms you gave them?

3    A.  I would say half a dozen to each person.

4    Q.  Did there come a time when you met with Mr. Sanchez and

5    Mr. Herrera that you met with other managers regarding the

6    exclusion forms?

7    A.  Yes, I did.

8    Q.  When was the next time you met with a manager?

9    A.  After I left Arnold Herrera, he called me and said that

10   Emilio from the 12th Street, Emilio, the last name escapes me

11   now.

12   Q.  Orjuela?

13   A.  Orjuela.  He spoke to Emilio Orjuela and Emilio wanted the

14   form.  So Emilio was at 12th Street and Arnold was at 94th

15   Street.  So he told me that Emilio needed the forms, so I went

16   back to the office to get more copies to give to Emilio.

17   Q.  And did you then go meet with Emilio?

18   A.  Yes, I did.

19   Q.  And what did you say to him and what did he say to you?

20   A.  I told Emilio these are the forms that Arnold told me that

21   you needed.

22   Q.  What did he say in response?

23   A.  He said, "Thank you very much."

24   Q.  When was the next time you had a conversation with the

25   manager about the exclusion forms?

1    A.   When I went back to the office to get more forms to give

2    one of them to Emilio, I stopped at the Narragansett Garage

3    where Bolivar Cartabena, he's a manager.  So when he got out

4    and he told me, by the way, I got a call from Arnold regarding

5    the exclusion form, do you have any with you?

6    Q.   He initiated the conversation?

7    A.   Yes, he did.

8    Q.   And what if anything did you say in response?

9    A.   I said I don't have them, I'm picking up copies from the

10   office and when I come back I'll give them to you.

11   Q.   What if anything did he say to you?

12   A.   He said okay.

13   Q.   When was the next time you spoke to a manager regarding the

14   exclusion forms?

15   A.   After I game him the forms he told me John Camidge and Joe

16   Bensey, two managers on the west side, one is at 49th Street

17   and the other one on 48th Street, he said they too were looking

18   for forms.

19   Q.   What if anything did you do in response to the comment

20   regarding Mr. Camidge and Mr. Bensey?

21   A.   I went to both of them and delivered the forms.

22   Q.   And what did they say in response when you provided the

23   form?

24   A.   They said thank you.

25   Q.   Did there come a time when you spoke with any other manager

1   regarding the exclusion forms?

2   A.   Yes.

3   Q.   Who was that?

4   A.   On the second day I spoke to John from Belmont.

5   Q.   Is that Calderon?

6   A.   John Calderon.

7   Q.   When did you speak with Mr. Calderon?

8   A.   I would say on Friday, because that was not the same day.

9   It was not Thursday, the same day that -- because Arnold had

10  spoken to John the next day.

11  Q.   What was the basis for you to speak to Mr. Calderon on

12  Friday?

13  A.   He was one of the managers that Arnold told me that needed

14  a form.

15  Q.   And when you saw Mr. Calderon that Friday, what if anything

16  did you say to him and what did he say to you?

17  A.   I told him these are the forms that you requested from

18  Arnold and he said yes.

19  Q.   Can you recall the other managers that you spoke with

20  regarding the exclusion forms?

21  A.   I spoke to Lionel Jean-Baptiste on East 83rd Street.

22  Q.   Tell me about your conversation with Mr. Baptiste?

23  A.   When I got to Baptiste's garage, he asked me for the form.

24  Arnold didn't give me Baptiste's name.

25  Q.   Did you initiate the conversation with Mr. Baptiste or did

1    he?

2    A.  No, I did not, because -- apparently from Thursday to the

3    next day there were conversation among the managers which, you

4    know, I didn't know whether it was from Arnold or not.  But

5    these guys came to me and asked me directly.

6    Q.  Do you recall any other managers you spoke with regarding

7    the exclusion form?

8    A.  Raymond Rosa.

9    Q.  And when did you speak with Mr. Rosa?

10   A.  Must have been on Friday.

11   Q.  And again, tell me the conversation you had with him?

12   A.  Raymond told me, he said, "Mike, I understand that there

13   are forms given out to opt out of the lawsuit.  I never

14   received mine."

15   Q.  And what if anything did you do in response to his comment?

16   A.  So I asked him, "Do you need a form?"  And he said, "Yes."

17   Q.  Do you recall speaking to any other managers regarding the

18   exclusion forms?

19   A.  Danny Veras from 82nd Street.  Arnold told me that he

20   needed a form and I went by his garage.  When I got there, I

21   couldn't enter the garage because, you know, it was a traffic

22   jam, so I double parked my car in the street.  He was sitting

23   in a vehicle in front of the garage.  So I told him, "These are

24   the forms that you requested."

25           He said, "Do I need to fill them now?"

C2EFGARH                        Isaac - direct

1          And I told him, "No, you read the instructions."  And

2     I left.

3     Q.  Was there anything else discussed with that individual at

4     that time?

5     A.  No.

6     Q.  Do you recall any other managers you spoke with regarding

7     the exclusion forms?

8     A.  Henry Russell asked me.  That was either Monday or Tuesday.

9     He asked me for the forms.

10    Q.  Did you see Mr. Russell on one of your daily stops?

11    A.  On a regular visit.

12    Q.  And do you recall who started the conversation regarding

13    the forms?

14    A.  He did.

15    Q.  What did he say?

16    A.  He said that I understand that there are some exclusion

17    forms, that he never received his, do I have a copy.

18    Q.  Do you recall speaking to another manager regarding the

19    exclusion forms?  Do you recall speak to Emil Solimon?

20    A.  Yes.

21    Q.  When did you --

22    A.  I spoke to Emil.  It's got to be Friday.  Again, Emil asked

23    me for the forms.  His exact words were, "Listen, I was never

24    in the lawsuit.  I understand there's a form to fill out.  Do

25    you have the form?"  And I told him yes.

C2EFGARH                           Isaac - direct

1   Q.  Did you ever speak to a Pablo Mayorgo?

2   A.  No, I have not.  Javier, I believe Javier spoke to him.

3   Q.  You never provided him any forms?

4   A.  Not to my recollection.

5   Q.  Did you ever speak to Orlando Mira?

6   A.  No, I did not.

7   Q.  Do you know if anyone spoke to him?

8   A.  Javier also spoke to him.

9   Q.  Did you ever speak to somebody by the name of James Isaac?

10  A.  Yes, I did.

11  Q.  Could you tell the Court who James Isaac is?

12  A.  He's my son.

13  Q.  Did he ever work for Garage Management Corporation?

14  A.  Yes.

15  Q.  He was a manager there?

16  A.  Yes.

17  Q.  Did he request forms from you?

18          MR. S. KAHN:  Objection.

19          THE COURT:  Sustained.

20  Q.  What if anything did you discuss with your son regarding

21  the exclusion forms?

22  A.  When he asked for them I gave it to him.

23  Q.  Did you ever speak to Angel Rosa?

24  A.  Yes.  I said that before.

25  Q.  And did you have a discussion with Mr. Rosa about the

C2EFGARH                          Isaac - direct

1   exclusion forms?

2   A.  He asked for the form.

3   Q.  Was this on your regular --

4   A.  Regular visit, yes.

5   Q.  Did you ever speak to a George Sam?

6   A.  Yes, I did.

7   Q.  Do you recall the conversation with Mr. Sam?

8   A.  Correct.  He said that he was never part of the lawsuit.

9   He said, "I understand there were some forms given out.  I

10  never received mine.  Do you have a copy?"

11  Q.  Did you ever speak to a Nelson Marmelejo?

12  A.  Yes.  When I got to the garage on my regular visit, Nelson

13  came out and said, "I don't need a form, all right, because I'm

14  in the lawsuit, I'm staying with it.  What do you think about

15  it?"

16          I said, "Listen, it's your prerogative.  You do

17  whatever you have to."

18  Q.  Did you ever speak to a Carlos Florez?

19  A.  Yes, I did.

20  Q.  Tell me about your conversation with him.

21  A.  He asked for a form and I gave it to him.

22          THE COURT:  Give me that name again, counsel?

23          MR. WEBER:  Carlos Florez, F-l-o-r-e-z I believe is

24  the spelling.

25          THE WITNESS:  Yes.

C2EFGARH                          Isaac - direct

1   Q.  Did you ever speak to Acel Rodriguez?

2   A.  Yes, I did.

3   Q.  Tell me about that conversation.

4   A.  Arnold told me that Rodriguez needed a form.

5   Q.  And did you visit his garage?

6   A.  Yes, I did.

7   Q.  What if anything did he say to you and you say to him?

8   A.  I said these are the forms that you asked for, and he said

9   thank you.

10  Q.  Did you ever speak to a Ricot Paliant?

11  A.  No, I did not.

12  Q.  Did you ever speak to a Paul Paliant?

13  A.  No I did not.

14  Q.  Did you ever speak to a Christian Gonzalez?

15  A.  No, I did not.

16  Q.  What about Ezechiel Middleton?

17  A.  No, I did not.

18  Q.  Did you ever speak to James Sampur?

19  A.  No, I did not.

20  Q.  What about Pierre Petit?

21  A.  No, I did not.

22  Q.  And Bob Tansey?

23  A.  No, I did not.

24  Q.  Have you ever given an exclusion form to any garage

25  managers that didn't ask for it directly or indirectly?

C2EFGARH                      Isaac - direct

1   A.  No, I did not.

2          MR. WEBER:  No further questions at this time, your

3   Honor.

4          THE COURT:  Thank you.

5   CROSS-EXAMINATION

6   BY MR. S. KAHN:

7   Q.  Mr. Isaac, how many forms did you give out all together?

8   A.  I would say about 15 or 16.

9   Q.  And how many workers are there all together?

10  A.  63.

11  Q.  It has to be more than that, because you told us that you

12  gave out six forms to two employees.  Six forms to Herrera and

13  six forms to somebody else.  Who was the other person?

14  A.  Javier Sanchez.

15  Q.  So that's twelve right there, right?

16  A.  Okay.

17  Q.  So how many forms do you think you gave out?

18  A.  As I said before, about 16 forms.

19  Q.  Okay.  Now, most of the -- well, you told us about more

20  than 16 today.  I mean, I could count them if you'd like, but

21  there's a lot more than 16, isn't it?

22  A.  Are you counting, are you including the 12 that I gave to

23  the guys?

24  Q.  I'd like to know all the forms you gave out.  How many

25  forms did you give out?

C2EFGARH                        Isaac - cross

1  A.  I gave 12 -- six each to each of these two managers and I

2  personally gave out 16.

3  Q.  Why did you give six each to these two managers?

4  A.  Because at the time they asked for forms to give to all the

5  managers themselves.

6  Q.  So you wanted to help them pass it out?

7          MR. WEBER:  Objection.

8          THE COURT:  Overruled.

9  A.  I wanted to do what?

10  Q.  You wanted to help these two guys pass out forms, correct?

11  A.  They asked for the forms and I gave them to him.

12  Q.  Almost nobody asked you for forms directly, isn't that

13  true?

14  A.  Well, I, as I stated, there were some guys who asked me

15  directly.

16  Q.  But mostly you were giving out forms to people Herrera told

17  you to give forms to, correct?

18  A.  Some of them, yes.

19  Q.  Did you give enough forms out so that people, the garage

20  managers started to think that this was the company's form?

21  A.  Can you repeat this?

22  Q.  Sure.  All the managers who got the forms from you and

23  because of you, did they know whether this was a form from the

24  Court or a form from the company?

25  A.  They knew it was a form from you.

1    Q.  How did they know that?

2    A.  Because that's what they asked, they spoke -- when Arnold

3    spoke to me originally, he told me that the forms came from

4    Mr. Kahn's office.

5    Q.  So Arnold already had a form?

6    A.  Excuse me?  Yes, Arnold sent his form by himself.

7    Q.  I see.  How many of these people that you gave forms to

8    didn't have a form from my office, do you know?

9    A.  I don't.

10   Q.  Did you give forms to people who already had forms?

11   A.  I only gave forms to people that Arnold told me that needed

12   or asked me personally.

13   Q.  How many garage -- you're called a garage supervisor,

14   right?

15   A.  Correct.

16   Q.  How many other garage supervisors are there?

17   A.  There are five other ones.

18   Q.  What are their names?

19   A.  Alex Gonzalez, Thomas Hernandez, Sal Gofel.

20   Q.  Dave Smythe?

21   A.  Dave used to be a supervisor.  He retired.

22   Q.  I see.  Dinero?

23   A.  Steve Dinero, yes.

24   Q.  Do you know, did any of them give out forms or were you the

25   only one?

C2EFGARH                          Isaac - cross

1    A.  I was the only one.

2    Q.  Why were you the only one?

3    A.  Because I was the only one that Doug contacted.

4    Q.  I see.  What did Doug tell you the rules were about giving

5    out forms?

6    A.  He said to give the forms to managers that asked for them.

7    Q.  Well, you gave the forms out to more than just the

8    managers -- did he say the managers who asked you?

9    A.  Managers that asked for the forms.

10   Q.  He was that general or did he say something more specific,

11   sir?

12   A.  That's what he said.

13   Q.  So you wound up giving forms to managers who didn't ask you

14   for them, did you?

15   A.  Well --

16   Q.  Excuse me, could you just answer my question?

17             MR. WEBER:  Your Honor, could you let the witness

18   finish the answer, please.

19             THE COURT:  Yes.  Don't interrupt the witness.

20             MR. WEBER:  Mr. Isaac, you can finish the answer.

21   A.  I went to the managers who spoke to Arnold and asked Arnold

22   for forms or Javier.

23   Q.  You don't know that they asked Arnold for forms, he just

24   told you that, isn't that correct?

25   A.  Yes.

1    Q.  So you don't know if Arnold was telling you the truth?

2    A.  Well, when I went to the garage I said these are the forms

3    that you asked for and they said yes, so I assume that they

4    spoke to them.

5    Q.  Do you remember giving an affidavit on about February 1

6    about passing out these forms?

7    A.  Yes, I did.

8    Q.  I'd like to ask you some questions about that afternoon.

9    Would you like a copy of it in your hand when I ask you those

10   questions?

11   A.  Yes, please.

12          MR. S. KAHN:  Your Honor, may I approach the witness?

13          THE COURT:  Yes.

14   Q.  Mr. Isaac, I'm handing you what appears to be a copy of

15   your affidavit dated February 1, 2012 and I've marked it

16   Plaintiff's Exhibit 1.  I've also handed another copy to

17   Mr. Weber and a copy to the Court.  Do you want to take a

18   moment and look at that again so you're familiar with it?

19          THE COURT:  Place your question, counsel.

20          MR. S. KAHN:  Sure.

21   Q.  You said in that, say in that affidavit that garage

22   managers contacted GMC to notify us that they had not received

23   the necessary paperwork.  Who was that?

24   A.  That was Arnold Herrera and Javier Sanchez.

25   Q.  But Arnold told you he had received the paperwork, hadn't

C2EFGARH                          Isaac - cross

1   he?

2   A.  Arnold told me what?

3   Q.  Didn't Arnold say he got the paperwork?

4   A.  Arnold said, originally that he had the papers himself,

5   yes.

6   Q.  So then Arnold wasn't one of the people who contacted GMC

7   to notify us that they had not received the paperwork because

8   Arnold got the paperwork, correct?

9   A.  Yes, Arnold said that he got his papers but the managers

10  spoke to him that they did not receive the paperwork.

11  Q.  So who were the managers that contacted GMC to notify GMC

12  that they did not receive the paperwork?  That's what you said

13  in your affidavit so I'd like to know who they are.

14  A.  Javier Sanchez was one of them, okay?  And when Arnold,

15  when Arnold called the office, we were under the impression

16  that he didn't have it originally.

17  Q.  What date did he call the office?

18  A.  You have to speak to Doug.  I don't remember the date.

19  Q.  He didn't speak to you?

20  A.  He didn't speak to me when --

21          MR. WEBER:  Your Honor --

22  A.  He didn't speak to me when he called the office.

23  Q.  So you don't know what Arnold said when he called the

24  office do you?

25  A.  No, but when he spoke to me before we went to Court, before

C2EFGARH                          Isaac - cross

1    Gordon Hamm went to Court he told me specifically there are

2    managers that didn't receive the forms and they wanted to know

3    what to do.

4    Q.  Now, your affidavit said garage managers contacted GMC that

5    they hadn't received the paperwork.  Who else besides Arnold,

6    if that's what he did?

7    A.  Well, I know of Arnold and Javier.

8    Q.  Did anybody walk up to you out of the blue and start a

9    conversation, any garage manager walk up to you and say oh, I

10   don't have the paperwork?

11   A.  Prior to speaking to Arnold or afterwards?

12   Q.  Any time.

13   A.  Yes.

14   Q.  Who?

15   A.  Bolivar Cartabena.

16   Q.  Who else?

17   A.  Lionel Baptiste, Jean Baptiste.

18   Q.  Who else?

19   A.  Emil Solimon.

20   Q.  Solimon.

21   A.  I could name a few, I mean --

22   Q.  Are there any others?

23   A.  Henry Russell.

24   Q.  Russell.

25   A.  Yes.

C2EFGARH                    Isaac - cross

1   Q.   Any others?

2   A.   Sam George.

3   Q.   Anyone else?  I'm asking about people who walked up to you,

4   started a conversation and said I don't have the court forms.

5          MR. WEBER:  Your Honor, I would ask that the list be

6   provided to the witness to refresh his recollection.

7          THE COURT:  Overruled.

8   A.   From the top of my head that's pretty much.

9   Q.   So everybody else you gave a form to is a person who did

10  not walk up to you and start a conversation saying I didn't get

11  the court form.

12         MR. WEBER:  Objection.

13  Q.   Is that correct?

14         THE COURT:  Overruled.

15  A.   As I stated before, the rest of the people that I spoke to

16  were, the names were given to me either by Arnold or Javier.

17  Q.   So everybody else you gave a form to, except for Sam

18  George, Russell, Cartabena, Baptiste and Solimon, everybody

19  else is a person who did not walk up to you and start a

20  conversation saying I didn't get a form, is that correct?

21  A.   That's correct.

22  Q.   You say in your affidavit that you were asked to deliver

23  the forms to the manager who contacted GMC.  Who asked you to

24  do that, please?

25  A.   Doug Kamm.

C2EFGARH                    Isaac - cross

1   Q.  What was the date that he did that?

2   A.  Must be the 18th.  The 17th or the 18th.  One of those.

3   Q.  You say in your affidavit, "In some cases there was

4   confusion where the manager did not understand why they

5   received it from the Court because they did not think that they

6   were part of this suit."  Do you see that in your affidavit?

7   A.  Yes, I do.

8   Q.  Okay.  Tell me, first of all, who are these managers?

9   A.  These managers, there was a group of managers that never

10  signed on --

11  Q.  I'd like to know their names, I'm sorry.  What are the

12  names of the managers?  I'll ask it more carefully, then.  What

13  are the names of the managers who were confused because they

14  didn't understand why they received the form from the Court

15  because they didn't think they were part of the suit?

16  A.  Henry Russell was one of them.

17  Q.  Who else?

18  A.  Javier Sanchez.

19  Q.  Who else?

20  A.  Bolivar Cartabena.

21  Q.  Who else?

22  A.  My son, James Isaac.

23  Q.  Who else?

24  A.  Did I give Lionel Jean Baptiste?

25  Q.  Anyone else?

C2EFGARH                        Isaac - cross

1   A.   Emil Solimon.

2   Q.   These are all people who told you that I was confused, I

3   don't understand why I received the forms from the Court

4   because I didn't think I was part of the lawsuit?

5   A.   Correct.

6   Q.   So these are all people who did have the form, aren't they?

7   A.   Excuse me?

8   Q.   All these people did get the form, didn't they?

9   A.   Not necessarily.

10  Q.   Well, they told you that they were confused that they got

11  the form, so they must have had the form, right?  It's got to

12  be one or the other, sir.

13  A.   They said they were confused because they got the form,

14  that's what I said?  What I said is they were confused that

15  they were in a lawsuit, not that they got the form.

16  Q.   Well, that's not what your affidavit says, is it?

17          MR. WEBER:  Objection.  What part of the affidavit do

18  you disagree with?

19          THE COURT:  Read the sentence to him.

20          MR. S. KAHN:  Your Honor, may I approach?  I'm afraid

21  I gave all my copies away and I'm reading from my notes.  I

22  just need to look at the affidavit myself.  I'm so sorry.

23  Q.   I'm looking at paragraph number 4.  If you count about

24  eight lines down, the first word at the margin on the left is

25  managers and then it says -- do you see where I am?

C2EFGARH                    Isaac - cross

1   A.  Yes, I see.

2   Q.  And then it says, quote, "In some cases there was confusion

3   where the manager did not understand why they received it from

4   the Court because they did not think they were part of the

5   suit," close quote.  So all those managers got the form, didn't

6   they?

7   A.  Well, they claimed they did not.

8   Q.  Pardon me?  You'll have to explain it.

9   A.  Explain which one?

10  Q.  Well, your affidavit says they did get the form, doesn't

11  it?  I don't want to confuse you.

12  A.  Yeah, I'm not confused, either.  When a manager tells me he

13  did not receive a form, I gave it to him.

14  Q.  But all of these managers you just identified; Baptiste

15  Russell, Sanchez, Cartabena, your son James and Solimon, they

16  said they did receive the form, they were puzzled that they got

17  it.  Which is it?  Just tell us.

18  A.  Well, I'll tell you exactly what it is.  They did not get

19  the form, according to them, okay, and it's probably a misquote

20  here as far as saying they're talking about the paperwork.

21  What I meant was talking about the lawsuit itself, not the

22  paperwork.

23  Q.  Let's talk about your son James.

24  A.  Okay.

25  Q.  What date did you give your son James the exclusion form?

C2EFGARH                          Isaac - cross

1   A.  Might have been Thursday the 18th.

2   Q.  Thursday the 18th.  Was he employed by the company at that

3   time?

4   A.  No, he was not.

5   Q.  Where were you when you gave your son James the form?

6   A.  Where was I when I gave him the form?

7   Q.  Yes.

8   A.  He came to my house.

9   Q.  Was that after work?

10  A.  After work.

11  Q.  In the evening?

12  A.  In the evening.

13  Q.  Was it a weekday or a weekend?

14  A.  It was on a Thursday, so it's a weekday.

15  Q.  And how did the subject of the -- when did James, I'm

16  sorry, when did James stop working for the company?

17  A.  In June or July.  It's got to be July.

18  Q.  July 2011?

19  A.  Correct.

20  Q.  About six months before you had a conversation with him,

21  correct?

22  A.  Correct.

23  Q.  How did the subject of the forms come up at your house in

24  January, 2012 with your son James?

25  A.  He got a paper form from my house.  He asked me when I was

C2EFGARH                          Isaac - cross

1    working.

2    Q.  Say again?

3    A.  He asked me when I was working on Thursday, during the day.

4    Q.  I'm sure I don't understand so I'm asking again.   Pardon

5    me.

6    A.  He called me that day and told me about the form.

7    Q.  He telephoned you?

8    A.  Correct.

9    Q.  What time of day did he telephone you?

10   A.  I don't quite remember.   Must have been the afternoon.

11   Q.  Where were you when he telephoned you?

12   A.  I was working.

13   Q.  Did he telephone you on a cell phone?

14   A.  Yes, he did.

15   Q.  And what did he say?

16   A.  He said he understands that a manager had called him from

17   GMC that there were forms given out, exclusion forms that he

18   never received himself.

19   Q.  Did he say that he understood that the company was giving

20   out exclusion forms and he didn't get one?

21   A.  Not the company.   There were forms given out was originally

22   issued from your office.

23   Q.  What manager was this?  Did James say?

24   A.  Bolivar.  Bolivar Cartabena.

25   Q.  So let's go through this very carefully.  James called you.

C2EFGARH                          Isaac - cross

1   I'd like as best you can to be like a tape recorder on replay.

2   I know you can't do that exactly, but try.  What did James say

3   about this?

4   A.  He said that Boli called me and said that, whether he had

5   received the forms, the exclusion forms or not, and he asked

6   Boli what forms are you talking about?  And he said the lawyer

7   from, from the case had sent forms to everybody, did you

8   receive yours and he said no, he did not.

9   Q.  That's what James told you?

10  A.  Correct.

11  Q.  You also say in your affidavit -- excuse me one second,

12  sir.  Where does Mr. Cartabena work?

13  A.  Narragansett garage.

14  Q.  Is that also called a Red Ball garage?

15  A.  No, it's not.

16  Q.  Is there an office at the garage that Mr. Cartabena works

17  at?

18  A.  It's a manager's office, yes.

19  Q.  Is there a postage machine in that office?

20  A.  I don't know.  I never seen one.

21  Q.  Okay.  You wouldn't think there'd be a postage machine in

22  that garage office, would you?

23  A.  No, there's a GMC office in the basement, but it's not part

24  of the garage.

25  Q.  Is there a postage machine there?

1   A.  There must be one, yes.

2   Q.  Does Red Ball have anything to do with Mr. Cartabena's

3   location?

4   A.  Mr. Cartabena used to work at Mason garage which no longer

5   exists and used to be part of the Red Ball group.

6   Q.  Mr. Isaac, I'd like to hand you what's been marked for

7   identification as Plaintiff's Exhibit 4.  Do you know how

8   Mr. Cartabena would get ahold of a Red Ball envelope?

9   A.  No, I would not.

10  Q.  Do you know how Mr. Cartabena would get an envelope franked

11  by Red Ball, you know, stamped with a postage machine?

12  A.  I would not.

13  Q.  He doesn't have one in his garage, does he?

14  A.  No, there is not in the garage.  There's one down in the

15  basement, as I said.

16          MR. S. KAHN:  Your Honor, I'll represent to the Court

17  that this is the envelope in which Mr. Cartabena's exclusion

18  form arrived at my office.  It's addressed to my office.

19  Q.  Do you think somebody from management helped Mr. Cartabena

20  mail this exclusion form to me?

21  A.  Along with the forms that were given to the managers, there

22  were also envelopes given to them.  Not stamped envelope but

23  regular envelopes.

24  Q.  Were they GMC envelopes?

25  A.  They were GMC envelopes, yes.

1   Q.  So you gave out GMC envelopes to all the --

2   A.  No, I'm sorry, they were given by GMC but they were plain

3   envelopes.

4   Q.  So GMC employees helped the managers with the envelopes

5   too, correct?

6   A.  We were given the forms with the envelopes, yes.

7   Q.  Were the envelopes addressed?

8   A.  Your address and the Court's address also.

9   Q.  That was on the envelopes?

10  A.  Correct.

11  Q.  Now, do you recall giving an affidavit in March 2011 in

12  this case?

13  A.  No, I don't remember.

14        MR. S. KAHN:  Your Honor, I'm sorry these aren't

15  premarked.  I just didn't know I would be using them.

16  Q.  I'm handing you a copy of what's captioned the declaration

17  of Mike Isaac and it's labeled Plaintiff's Exhibit 5.  Would

18  you take a look at that, please?  Is that an affidavit that you

19  gave before?

20  A.  Yes, it is.

21  Q.  It says in this affidavit, and I'm looking at paragraphs 4,

22  5 and 6, that you were talking about this lawsuit in May of

23  2010 with some of the very same people you talked about today;

24  John Camidge, Sam Cruz, Joe Bensey.  Do you see that?

25  A.  I didn't speak to Sam Cruz on the 2nd.

C2EFGARH                          Isaac – cross

1    Q.   You didn't speak to Sam Cruz this time around?

2    A.   No.

3    Q.   But you did speak to Bensey, correct?

4    A.   Spoke to Bensey.

5    Q.   Both times, right?

6    A.   Yes.

7    Q.   Spoke to Camidge both times?

8    A.   Correct.

9    Q.   Did you ever pass out to these people documents that GMC

10   would guarantee that they would be paid if they dropped out of

11   the lawsuit?

12   A.   Yes, I did.

13   Q.   How many of those documents did you pass out?

14   A.   I don't remember.

15   Q.   Let me ask you a question:  Do you think the garage

16   managers by and large trust Mr. Chapman?

17   A.   Yes, I do.

18   Q.   Do you think by and large the garage managers think

19   Mr. Chapman keeps his word?

20   A.   Yes, they do.

21   Q.   I'd like to hand you what's been marked as Plaintiff's

22   Exhibit 3.  That's a May 21, 2010 letter.  Is that the letter

23   you passed out?

24   A.   Yes, I did.

25   Q.   How many of those did you pass out?

C2EFGARH                              Isaac - cross

1   A.  I don't remember.

2   Q.  Did you pass them out to every garage you go to?

3   A.  Possibly.

4   Q.  Probably?

5   A.  Probably.

6   Q.  You probably passed them out to every garage manager,

7   didn't you?

8   A.  It's a while back, but I gave them to quite a few people.

9   Q.  Okay, and this document guarantees that they'll be paid if

10  they drop out of the lawsuit, doesn't it?

11  A.  That's what it says.

12  Q.  And the men trust Mr. Chapman, correct?

13  A.  They do.

14  Q.  Was this document ever revoked?  Did the company ever say

15  we won't keep our guarantee, we wouldn't pay you if you drop

16  out of the lawsuit?

17  A.  Not to my knowledge.

18  Q.  So this guarantee is still in effect, as far as you know,

19  talking about Plaintiff's Exhibit 3 guarantee.  Still in

20  effect?

21  A.  As far as I know.

22          MR. S. KAHN:  I have no more questions for this

23  witness, your Honor.

24          THE COURT:  Any redirect?

25          MR. WEBER:  May I have one minute, your Honor?

1          (Pause)

2          MR. WEBER:  A few questions, your Honor.

3    REDIRECT EXAMINATION

4    BY MR. WEBER:

5    Q.  Mr. Isaac, you were asked questions about some confusion of

6    the men concerning this lawsuit.  Do you remember when the

7    managers were first in a meeting in 2010 when this lawsuit was

8    proposed?

9          MR. S. KAHN:  Objection.  Unless the witness has

10   firsthand knowledge.

11         THE COURT:  Were you at that meeting?

12         THE WITNESS:  I was not.

13   Q.  Did any garage managers who attended a union meeting in

14   2010 tell you that they thought they signed an attendance sheet

15   when they were at the meeting?

16   A.  Yes, they did.

17   Q.  Did they subsequently learn that they signed something

18   else?

19         MR. S. KAHN:  Objection.

20   Q.  Were you told by any manager that they subsequently learned

21   that they signed some other document?

22   A.  Yes, they did.

23   Q.  What were you subsequently told by a manager or more

24   managers?

25   A.  That they thought they were signing an attendance sheet and

1    then they found out later that they were joining a lawsuit

2    brought by McLean and Rivera.

3    Q.  And is that where this confusion stems from, to your

4    knowledge?

5    A.  Correct.

6          MR. WEBER:  No further questions.

7          MR. S. KAHN:  May I, your Honor?

8    RECROSS EXAMINATION

9    BY MR. S. KAHN:

10   Q.  Well, if we look at your first affidavit, the February 2012

11   affidavit, is that back in front of you?

12   A.  Okay.

13   Q.  Let's go to that same sentence we talked about.  There

14   you're talking about confusion among garage managers who didn't

15   understand why they got a form from the Court.  So that must

16   have happened very recently, correct?

17   A.  In this instance.

18   Q.  When was that union meeting that Mr. Weber just asked you

19   about, if you know?

20   A.  Probably a year and a half ago.

21   Q.  Okay.  But the confusion you're talking about in your

22   February 1 affidavit is confusion about the notices that were

23   mailed on November 27, 2011, isn't it?

24   A.  Yes, it was.

25          MR. S. KAHN:  Okay.  Thanks.

1              THE COURT:  Any redirect?

2              MR. WEBER:  No, your Honor.

3              THE COURT:  Thank you.

4         So, Mr. Isaac, you mentioned that there are other

5    supervisors who hold positions similar to yours, and I think

6    you named five people who currently or in the past have held a

7    similar position; Mr. Gonzalez, Mr. Hernandez, Mr. Smythe,

8    Mr. Dinero and is it Mr. Gofel?

9              THE WITNESS:  Gofel.

10             THE COURT:  Thank you.  And do they have different

11   garages that they visit or different shifts that they work on?

12             THE WITNESS:  They work on different shifts.

13             THE COURT:  So you cover on your shift 63 garages.

14             THE WITNESS:  Correct.

15             THE COURT:  And these other five supervisors cover the

16   same 63 garages but in different shifts?

17             THE WITNESS:  That's correct.

18             THE COURT:  It sounded like many of the people to whom

19   you delivered the forms had spoken with either Mr. Herrera or

20   Mr. Sanchez before you spoke with them.  Is that fair to say?

21             THE WITNESS:  That's correct.

22             THE COURT:  Is there anyone that you delivered a form

23   to recently, in January that hadn't first spoken to Mr. Herrera

24   or Mr. Sanchez about the form?

25             THE WITNESS:  I doubt that.

C2EFGARH                          Isaac - recross

1              THE COURT:  And you were given packages, some of which

2    you gave to Mr. Herrera, some of which you gave to Mr. Sanchez,

3    some of which you gave to other individuals, right?

4              THE WITNESS:  Correct.

5              THE COURT:  In that package -- what was in that

6    package?

7              THE WITNESS:  There were three pages on the package.

8    There was the exclusion form, there was a form that said you

9    can opt in or out of it, and there was a cover, the Court

10   orders, there were three forms, I mean, three sheets.

11             THE COURT:  And you said there were some envelopes?

12             THE WITNESS:  Yes, also.

13             THE COURT:  How many envelopes?

14             THE WITNESS:  Pretty much each package had two

15   envelopes.  One to the Court, addressed to the Court, the other

16   one addressed to Mr. Kahn's office.

17             THE COURT:  Was there postage on the envelope?

18             THE WITNESS:  No, they were not on the ones that I had

19   given out.

20             THE COURT:  So each package had three pages of

21   documents and two envelopes.

22             THE WITNESS:  Correct.

23             THE COURT:  And were they held together by a paper

24   clip or are they inside their own larger envelope?

25             THE WITNESS:  No.  Three pages was stapled.  The

C2EFGARH                          Isaac - recross

1    envelopes were separate.

2              THE COURT:  And how did you hold them all together to

3    hand out one package to one person?

4              THE WITNESS:  I would hand the package along with the

5    two envelopes.

6              THE COURT:  And who gave you instructions with respect

7    to handing out the two envelopes with the three pages of

8    documents?

9              THE WITNESS:  Doug Kamm, the director of personnel.

10             THE COURT:  Now, Mr. Herrera has worked as a garage

11   manager for a number of years?

12             THE WITNESS:  That's correct.

13             THE COURT:  How many years, roughly?

14             THE WITNESS:  Over 15 years I'd say.

15             THE COURT:  And is Mr. Sanchez also a long term

16   employee?

17             THE WITNESS:  Yes, he is.

18             THE COURT:  Roughly how many years do you think he's

19   worked as a garage manager?

20             THE WITNESS:  I would say about 12 years; 12, 15

21   years.

22             THE COURT:  If I understood correctly, Mr. Herrera had

23   received the mailed letter from Mr. Kahn's office, so he didn't

24   need another copy from you, am I right?

25             THE WITNESS:  Originally that's what we understood.

C2EFGARH                          Isaac - recross

1    We thought he didn't receive it either, but afterwards, after

2    the sheets were delivered, he said that he had already sent his

3    that he had received.

4           THE COURT:  And with respect to Mr. Sanchez, had he

5    received, did he tell you that he had or had not received the

6    form in the mail from Mr. Kahn's office?

7           THE WITNESS:  He originally told Doug Kamm that he did

8    not receive the forms.

9           THE COURT:  What did he tell you?

10          THE WITNESS:  Well, my contact with him was when I

11   delivered the form.  I said these are the forms that you asked

12   Doug for and give it to him, so he said thank you.

13          THE COURT:  Okay.  I want to make sure that counsel

14   don't have additional questions for the witness based on any of

15   the questions I put to him.  Let me ask you first, Mr. Weber,

16   did you have any additional questions for the witness based on

17   the questions I put to him?

18          MR. WEBER:  Just to clarify the reporting

19   relationship, I think, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. WEBER:

22   Q.  Mr. Isaac, you're the senior supervisor of that group for

23   the company?

24   A.  Yes, sir.

25   Q.  And the other supervisors report to you?

C2EFGARH                        Isaac - redirect

 1   A.  Correct.

 2   Q.  And they have different responsibilities than you?

 3   A.  Yes, they do.

 4              MR. WEBER:  That's all, your Honor.

 5              THE COURT:  Thank you.  Mr. Kahn?

 6              MR. S. KAHN:  No, I do not, your Honor, but I would

 7   like to note that the Court's, that the clerk's docket shows

 8   that Arnold Herrera filed an exclusion form on about

 9   January 11, 2012.  I'm not looking at the docket myself, but my

10   notes.  I believe my notes are accurate, your Honor.

11              THE COURT:  You may step down.  Thank you.

12              (Witness excused)

13              THE COURT:  So, Mr. Weber, I don't know if you need to

14   call your second witness.  You know better than I whether you

15   think his testimony will be helpful.

16              MR. WEBER:  I think if there's any question about the

17   process, your Honor, I'd like to call him just to make sure

18   we're clear on what occurred.

19              THE COURT:  Okay, fine.

20    DOUGLAS KAMM,

21       called as a witness by the Defendants,

22       having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. WEBER:

25   Q.  Mr. Kamm, can you briefly tell us your employment history

1  with GMC?

2  A.  I originally worked for GMC from 1986 through 2000.  I left

3  the industry to raise my three boys and came back to GMC in

4  late May of 2010 and I'm presently there.

5  Q.  And can you tell us your job responsibilities during both

6  stints with the company?

7  A.  I was initially hired as director of personnel.  I was

8  given the mandate of setting up a personnel function for the

9  company, everything from salary administration to benefits to

10  labor relations.  I wrote a company manual.  I wrote rules and

11  regulations for the company and handled basic employee

12  relations problems.

13  Q.  You dealt with the managers on a regular basis?

14  A.  Yes, I did.

15  Q.  Did you ever have any dealings with the Department of

16  Labor?

17  A.  Yes, I did.

18  Q.  Have you dealt with the union on union-related issues?

19  A.  Yes, I have.

20  Q.  Let me direct your attention to the focus of today's

21  hearing, the issue of exclusion, the opt out forms of the

22  managers.  When is the first time you got involved with the

23  issue of request by managers to drop out of the lawsuit?  Can

24  you recall that?

25  A.  My first exposure --

1            MR. S. KAHN:  Objection.  There really is no request

2    for managers to drop out of a lawsuit, your Honor.

3    Q.  Let me focus it more directly.  Did any manager ever call

4    you about a request for exclusion forms?

5    A.  Yes.

6    Q.  Who was that?

7    A.  The first call was from a manager Arnold Herrera.

8    Q.  When did Mr. Herrera call you?

9    A.  This was in the early part of January.

10   Q.  What if anything did he say to you?

11   A.  He told me that several managers did not want to be part of

12   this suit and he didn't know what to do and he asked my advice.

13   Q.  What did you say?

14   A.  I said there are forms, there are exclusion notices and

15   there are notices about the case that have been issued.  I

16   would see if I could get him a copy of those forms.

17   Q.  What if anything did you do after that?

18   A.  I reported the phone call to my superiors, Richard Chapman

19   and Gordon Hamm, and asked for their advice as to what to do.

20   Q.  Do you recall what they told you?

21   A.  They said that they would seek further guidance as far as

22   whether it would be right for me to give out the notices and

23   the exclusion requests.

24   Q.  What happened next related to this issue?

25   A.  They followed up on my request and that evening I received

C2EFGARH                         Kamm - direct

1    an e-mail from them saying that the Court had issued a ruling

2    that we may not initiate any conversation with our managers,

3    but if someone, if one of the managers initiated a conversation

4    we could provide them with the forms.

5    Q.   What if anything did you do regarding providing managers

6    with forms if anything?

7    A.   I made copies of the notice and the exclusion request and

8    provided them to a supervisor for distribution.

9    Q.   Was that Mike Isaacs?

10   A.   Yes, it was.

11   Q.   Did you have any other dealings after that with any

12   managers regarding the exclusion forms?

13   A.   Yes.  I received a subsequent phone call from manager

14   Javier Sanchez who is the manager of the Continental Towers

15   Garage who told me he had spoken to Arnold Herrera and Arnold

16   told him to call me.  He did need a form, he had never received

17   one and he did not want to be part of the case.  I told him

18   that I could not discuss it with him, I would see he got a form

19   and he was to just read it and follow directions and do what he

20   felt was right.

21   Q.   Did you take steps to get him a form?

22   A.   I did.

23   Q.   What did you do?

24   A.   I made copies of the form and provided them to Mike Isaac

25   to distribute.

C2EFGARH                      Kamm - direct

1   Q.  Did you have any other contact with any managers regarding

2   exclusion forms?

3   A.  I did not.

4   Q.  Any manager express any opinion to you why they would want

5   to drop out of this lawsuit?

6   A.  If I could just ask does that question refer to subsequent

7   to the guidance of the Court in January?  No.

8   Q.  Subsequent to the guidance from the Court?

9   A.  No, I did not receive any further calls from managers.

10          MR. WEBER:  No further questions, your Honor.  Oh, I

11  do have one question.

12  Q.  Did you give Mr. Isaac any instructions regarding what he

13  should or shouldn't do in dealing with the garage managers?

14  A.  Yes, I did.

15  Q.  What did you tell him?

16  A.  I reiterated the Court's guidance that he should in no way

17  initiate a conversation with the managers, that he should only

18  react to requests from them and just give them the forms and

19  not comment on the case.

20          MR. WEBER:  Thank you.

21  CROSS-EXAMINATION

22  BY MR. S. KAHN:

23  Q.  Just a very few questions, Mr. Kamm.  Did you ever read the

24  Court's October 21 order regarding permitted or banned

25  communication with the class members about this lawsuit?

C2EFGARH                          Kamm - cross

1    A.  Could you explain the -- the date doesn't sound familiar.

2    Could you tell me what the document said?

3    Q.  Sure.  I don't have it in my hand, but it said in substance

4    that GMC was not permitted to solicit withdrawals from the

5    lawsuit.  Did you ever read that order?

6    A.  Yes, I'm familiar with that.

7    Q.  Okay.  Did you read it?  Or did someone just tell you about

8    it?

9    A.  I'm familiar with the -- I don't remember if I read it

10   completely.

11   Q.  Did you read the Court's January 17th endorsement which

12   said any garage manager who initiates conversation regarding

13   the litigation may be provided with another copy of the notice

14   and the attached exclusion request or be directed to

15   plaintiff's counsel?

16   A.  Yes, I did read that.

17   Q.  When did you read that?

18   A.  Shortly after it was issued by the Court.

19   Q.  How many copies of the form did you photocopy?

20   A.  Approximately ten.

21   Q.  Well, if one followed along with Mr. Isaac's testimony, I

22   calculate he gave out about 30 forms.  Do you think you might

23   have given him 30 packets of forms?

24   A.  No.  I copied approximately ten.

25   Q.  Who else copied packets of forms; do you know?

1  A.  I don't know.  We have clerical people in the office.  I

2  don't know.

3  Q.  What exactly did you say to Mr. Isaac when you gave him

4  instructions?

5  A.  Be sure not to initiate any conversations with managers

6  regarding the exclusion requests.  Just react to people who

7  requested them.

8  Q.  Why did you speak to Mr. Isaac about this and not some

9  other garage supervisor?

10  A.  Mr. Isaac is the head supervisor.

11  Q.  I see.  Now, you got a call from Mr. Javier Sanchez?

12  A.  Yes, I did.

13  Q.  And he wanted a form?

14  A.  Yes, he did.

15  Q.  Mr. Isaac said he delivered six forms approximately to

16  Mr. Javier Sanchez.  Why would that be?

17  A.  Mr. Sanchez said he had spoken in turn with several

18  managers and they also had the same problem as he did.

19          MR. S. KAHN:  No further questions.  Thank you, sir.

20          MR. WEBER:  Your Honor --

21  REDIRECT EXAMINATION

22  BY MR. WEBER:

23  Q.  Mr. Kamm, there's been a suggestion that the managers

24  wouldn't on their own withdraw from this lawsuit without some

25  influence by the company.  Do you have an opinion as to why

C2EFGARH                      Kamm - redirect

1   those managers withdrew?

2            MR. S. KAHN:  Objection.

3            THE COURT:  Sustained.

4            MR. WEBER:  No further questions.

5            So, Mr. Kamm, what precisely, could you describe the

6   documents you gave to Mr. Isaac?

7            THE WITNESS:  Yes, I can.  There were two pages, that

8   was the notice from the Court and there was one page that was

9   the actual exclusion request form.  There's three pages that I

10  distributed.

11           THE COURT:  Did you give Mr. Isaac anything else

12  besides those three pages?

13           THE WITNESS:  He mentioned that some managers do not

14  have, they would need envelopes and they would not have them at

15  the garage, and I gave him some envelopes, a couple of which I

16  addressed, particularly in light of the Spanish-speaking

17  managers.  I felt that was okay to do.

18           THE COURT:  And who did you address the envelopes to?

19           THE WITNESS:  Per the instructions on the exclusion

20  request and on the notice, one of the envelopes was addressed

21  to Mr. Stephen Kahn and one to the Court, the Southern District

22  Court with the appropriate address.

23           THE COURT:  So, in effect, an individual package had

24  three pages and two envelopes.

25           THE WITNESS:  In some cases -- well -- no, I gave Mr.

1    Isaac the envelopes separately and said if you need them you

2    may use these.  I didn't include them with each package.  The

3    packages were separate.

4              THE COURT:  Counsel, do you have any questions for

5    this witness?

6              MR. S. KAHN:  No, your Honor, thank you.

7              MR. WEBER:  No, your Honor.

8              THE COURT:  You may step down.  Thank you.

9              (Witness excused)

10             THE COURT:  So, Mr. Kahn, you wish to be heard.

11             MR. S. KAHN:  I do, your Honor.  It's very plain that

12   Garage Management violated paragraph 8 of your October 21st

13   order which limited them and told them not to solicit

14   withdrawals and they violated your January 17th order which

15   told them they were only to hand forms to people who initiated

16   conversations.  Assuming that Mr. Isaac's testimony was

17   entirely credible and he did not minimize his involvement and

18   I'll make that assumption for the sake of argument only, if you

19   count, he passed out at least 30 forms with addressed envelopes

20   to people who never asked for the forms.  Clearly, some of the

21   people had forms already, that's what his affidavit said, that

22   some of these garage managers had the forms so there's no

23   reason they would be asking him to give them a copy of the

24   form.  It seems that word gets out that the company is passing

25   out exclusion forms to the point where some garage managers

1    even asked Mr. Isaac, hey, I hear you're passing out exclusion

2    forms, give me an exclusion form.  This is inherently -- and

3    they attach envelopes to the forms, which of course was never

4    part of the Court's order to make it easy to drop out of the

5    lawsuit.  Judge, it's very hard to believe that when the boss

6    comes up to you, hands you an exclusion form with a

7    self-addressed stamped envelope that you're not supposed to

8    sign it and put it in the mail.  And that's why we have this

9    flurry of withdrawals that are not at all representative of the

10   withdrawals until Mr. Isaac and aided by Mr. Kamm started

11   campaigning to get people out of the lawsuit.

12          Why did people drop out of the lawsuit?  Because the

13   boss handed a form to them and because it didn't cost them

14   anything because GMC had already guaranteed it would make them

15   whole if they dropped out of the lawsuit and everybody trusts

16   GMC and their guarantee which should never have been revoked.

17   Your Honor, this is well beyond your order.  It's improper in

18   any circumstance.  I've cited some of those cases in my prior

19   correspondence to the Court.  I believe that all of the post

20   January 17 exclusions should be struck because they were

21   gathered in an improper manner.  Thank you.

22          MR. WEBER:  There's nothing in the record that

23   supports one thing that Mr. Kahn said.  Indeed, the opposite is

24   true.  Everyone complied with your earlier order and that's why

25   it was not until we got guidance from your Honor that you saw

C2EFGARH                      Kamm - redirect

1    the withdrawals until January.  They didn't want to be a part

2    of this lawsuit.  Half of them didn't understand what they were

3    getting into.  I wanted Mr. Kamm to explain why the garage

4    managers felt that way, Mr. Stephen Kahn objected.  These are

5    managers that get paid three times what the union contract

6    provides.  They've been employed 10, 15, 20, 25 years.  They

7    get paid extremely well.  They are treated extremely well.

8    They like being managers, they like the title.  They got great

9    benefits and great wages.  This isn't some slum place.  They

10   are they are very well treated and they don't want to be part

11   of this lawsuit and they withdraw on their own volition, not

12   because they were threatened.

13           You heard my guy Isaacs.  He responded to requests.

14   He didn't go threaten them.  Where are Mr. Kahn's witnesses to

15   say oh, I was pressured.  Where are they today?  They couldn't

16   come here and testify to the truth because in my opinion they

17   would be perjuring themselves.  Nobody was pressured here.

18           Some members of the class wanted to stay in and they

19   have every right to stay in, and the majority in fact are in.

20   But some don't want to be, and if you looked at their history

21   with the company, they're long-term employees, treated well,

22   paid three times what the union contract requires.  It's not a

23   surprise they would withdraw for that reason.

24           THE COURT:  So, counsel, thank you for your

25   participation today in this hearing to help explore these

important issues.  Let me just give you some reactions to what

I've heard.

On November 23rd or so, the class action notice and

exclusion form was mailed, so that's roughly around

Thanksgiving time.  We have our first request for exclusion

dated December 11th from a Mr. Tansey, and then we have two

early January requests that were entered on the court docket on

January 6 and January 9.  I don't actually have the date that

the request, the exclusion form itself bears, and they came

from a Mr. Paillant and a Mr. Petit.

Then we have Mr. Herrera.  I don't have the date on

his form, but it was entered on the court record on January 11.

And that's where things stood until January 24th.  So we had

four requests for exclusion.  I don't know how large the class

is, but there are 63 garages, so just a handful of requests for

exclusion.  And then on January 24th to January 27th bearing

dates -- I shouldn't say that.  The January 24th to

January 27th dates are when there was an entry on the court

record, which is less relevant, I suppose in some senses

perhaps than the records on the exclusion request forms

themselves.  But we have with Mr. Sanchez' form which is dated

January 18th and was entered on the court record January 24th,

roughly 11 request forms that come within a few days of each

other.  And two more that bear dates of January 3rd and

January 9th that are not entered on the Court record until

C2EFGARH                    Kamm - redirect

January 25th and January 27th.  They are Mr. Sam and

Mr. Rodriguez.  Because I don't have, I'm not going to pull

out -- not Mr. Rodriguez, I'm sorry.  Mr. Sam is dated

January 3rd entered on the court docket January 27th.  Paul

Paillant is dated January 9th entered on the Court docket

January 25th.

         So let's just talk in terms of roughly 11.  It seems

pretty clear to me from the testimony here that two individuals

orchestrated a little campaign, Mr. Herrera and Mr. Sanchez, to

get some of their buddies to opt out.  And to let the company

know that this was happening, and they even reached out to a

former employee, the son of our first witness.  So I don't have

the basis to find that these 10 or 11 individuals actually on

their own, having thought about the notice form and the

decision to be made here, decided they wanted to opt out.  I

have these 10 or 11 people responding to conversations with two

witnesses who were before me, Mr. Herrera and Mr. Sanchez, and

communicating their desire to Mr. Herrera and Mr. Sanchez that

they want to opt out and happy to receive such forms with

envelopes conveniently provided from a supervisor.  And of

course as background the company has given assurance that

nobody will be receiving any less wages than are provided to

class members who stay in.  So they curry favor with the

company by specifically asking a supervisor for the opt-out

form.  The company conveys their desire that this happened,

C2EFGARH                        Kamm - redirect

1    presenting them with envelopes, some of them conveniently

2    addressed.  I don't think this is how the process is supposed

3    to work.

4            I think my endorsement did not help things.  I should

5    not have permitted the company to pass out copies.  There's too

6    much of a message that's given when that happens that we

7    actually want you to sign the form, particularly when envelopes

8    are presented with the package.

9            I don't know what precisely to do about this right

10   now.  I think the people whose opt-out requests are affected

11   are Pablo Mayorgo, Mr. Baptiste, Mr. Soliman, Salvador

12   Rodriguez, James Isaac,henry Russell, Emilio Orjuela, John

13   Camidge, Bolivar Cartabena and Angel Rosa.  There may be a

14   couple of others in addition that are included in this suspect

15   class, but I'd have to look more carefully at the underlying

16   documents and learn more.

17           Mr. Weber?

18           MR. WEBER:  Your Honor, I heard Mr. Isaac say that

19   managers approached Mr. Herrera for various reasons.  They were

20   confused, they didn't get forms.  I didn't hear Mr. Isaac say

21   Mr. Herrera sort of went out and rounded up the usual suspects

22   to get curry with the company.  That's my understanding of what

23   the testimony was, and since Mr. Herrera was one of the early

24   opt outs, maybe word got out, as your Honor suggested, he opted

25   out, maybe others wanted to do the same.  I didn't hear that

1   Mr. Herrera went out looking for support.  I heard something

2   else.  I just want to make that observation.

3            THE COURT:  Okay, well, we don't actually know, do we?

4            MR. WEBER:  No, your Honor.

5            THE COURT:  We don't have Mr. Herrera here, we don't

6   have Mr. Sanchez here, we don't have the opt outs.  The

7   campaign that circumstantially, well, not just

8   circumstantially -- Mr. Isaac told us quite clearly that he

9   understood that everyone he spoke with and to whom he handed a

10  form had had a conversation before with Mr. Herrera and

11  Mr. Sanchez, one or the other.  So Mr. Isaac isn't in a

12  position to know what those conversations were.

13           MR. WEBER:  Your Honor, look at your order.  I think

14  the order was complied with.

15           THE COURT:  Well, I have to say I don't want to push

16  this further than we need to go.  When we met last week we

17  talked about -- was it last week, the week before, whenever, we

18  talked about what is the purpose of this.  Of course, you know,

19  potentially if there's a violation of the order there's an

20  inquiry with respect to contempt and other sanctions, but I

21  think we agreed at our prior conference the real purpose of

22  this is to find, to explore the legitimacy of the opt-out

23  process and to reflect on that and figure out what should be

24  done if the process for some reason has not worked as it

25  should.

1          So I think what I would propose doing is that we all

2     reflect on what we've learned this afternoon.  I don't think I

3     have to find that Mr. Herrera or Mr. Sanchez, if they did

4     conduct a little mini campaign here among their buddies -- by

5     the way, I don't know how many of them work at the same

6     garage --

7                MR. WEBER:  All separate garages.

8                THE COURT:  That was my understanding, so it means

9     they had to actually get on the phone, they had to make an

10    effort to communicate with these other folks.  Whatever

11    happened, we'd need them before us to shed light on it.  But

12    they were at the hub of communications that resulted in 10, 11,

13    12 people opting out during a very short period of time.  And

14    with activity by the company which would have permitted each of

15    those opt out individuals to feel that the company was aware

16    they were opting out and appreciated that.

17         Now, I don't want to cast aspersions, I don't think we

18    need to do that on anybody's motives here who testified before

19    me today.  I'm not anxious to go down that road.  I don't know

20    that I need to.  I think there is a larger question here,

21    though, about the legitimacy of this process with respect to

22    these 11 or so people.

23                Mr. Kahn?

24                MR. S. KAHN:  Yes, if I might be heard.  The Court

25    brings out a very important point.  I never did apply for

1   sanctions or contempt and I might have, but that doesn't really

2   interest me.  What interests me is representing the members of

3   the class, not punishing the company and getting a remedy for

4   class members who did not receive their lawful overtime pay.

5   The company, unfortunately, abused the process and the well is

6   now poisoned.  What one would wish one could do is put Henry

7   Russell on the witness stand and say Henry, what do you really

8   want here.  But we can't do that anymore, Judge.

9              THE COURT:  Mr. Kahn, I'm going to ask you to not --

10  to just reflect.  I'm not going to ask you to make an

11  application now.  I think we all need to think about this.  And

12  then I would like Mr. Kahn and Mr. Weber to talk about it.

13             MR. S. KAHN:  In my reflection, then, your Honor, and

14  I do think that's a very good idea because I know these people

15  have filed forms.  The difficulty that I encounter and perhaps

16  the Court or Mr. Weber might figure out how to solve it is

17  there is now no way to find out what is in Mr. Henry Russell's

18  independent heart of hearts with regard to his participation in

19  this lawsuit.  We just can't put the guy on the witness stand

20  in front of his company's lawyers and his company's

21  supervisors.

22             THE COURT:  So, Mr. Kahn, I don't really think it's

23  helpful right now --

24             MR. S. KAHN:  I apologize, Judge.

25             THE COURT:  To just --

C2EFGARH                          Kamm - redirect

1          MR. S. KAHN:  I'm not making an application, your

2     Honor, I understand.  I'm just troubled by that myself.

3          THE COURT:  Okay.  So you'll have a chance to think

4     about this.  We have a schedule for a pretrial order and a

5     trial, and when counsel have separately reflected and then

6     talked to each other about it, I'll have separate or joint

7     applications or not.  Thank you.

8          MR. SCHER:  Your Honor, if I may, there was one

9     further issue.  When we last met your Honor asked the parties

10     to confer jointly to see if we could come to a conclusion about

11     how to proceed in consolidation.  I've attempted those

12     conversations with the parties.  They seem to be progressing a

13     little bit more slowly than I had hoped they would by this

14     point, so I look to your Honor for guidance as to whether we

15     should take more time for those discussions or whether we

16     should proceed in some other way.

17          THE COURT:  Well, Mr. Scher, I don't know what your

18     application is.  Do you need more time?

19          MR. SCHER:  Yes.  Yes, we would like some more time to

20     work on a joint proposal.

21          THE COURT:  Would you like a week?

22          MR. SCHER:  Yes.

23          THE COURT:  Good.  Thank you.

24          MR. SCHER:  Thank you, your Honor.

25          (Adjourned)